(No. 14680.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LEAMON HEARD, Plaintiff in Error.

*Opinion filed October 21, 1922—Rehearing denied Dec. 8, 1922.*

1. CRIMINAL LAW—*when giving of numerous instructions can not be regarded as prejudicial.* The practice of giving numerous instructions on the subjects of reasonable doubt, self-defense and malice is improper but will not be regarded as prejudicial in a murder trial, where the evidence is such that no intelligent juror, acting under his oath, could have acquitted the defendant of the homicide and where the verdict of the jury is manslaughter.

2. SAME—*literal and technical accuracy in instructions is not required.* Literal and technical accuracy in instructions is not required, provided the instructions given, considered as a series, fairly present the case to the jury with substantial accuracy.

WRIT OF ERROR to the Circuit Court of Saline county; the Hon. A. E. SOMERS, Judge, presiding.

FOWLER & RUMSEY, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, CHARLES H. THOMPSON, State's Attorney, and FLOYD E. BRITTON, for the People.

Mr. CHIEF JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, Leamon Heard, was indicted and tried in the circuit court of Saline county for the murder of Floyd Phillips and was convicted of manslaughter and sentenced to imprisonment in the penitentiary.

While there is some dispute regarding the facts, it seems to arise more from the unexpected and tragic end of a frivolous quarrel and a lack of opportunity to see and hear what occurred than from a desire on the part of any of the disinterested witnesses to testify falsely. The great weight of the evidence shows that the events leading to, surrounding and immediately following the shooting were substantially as follows: June 4, 1921, Gilbert Hall, a farmer residing in the northeast corner of Saline county, was the host at a public dance and ice-cream social given at his farm home. There is a long porch extending the full length of the front of the house, which faces the east. There are two rooms on the east side of the house and a door leading from each room to the porch. Tables for serving ice-cream were in the northeast corner of the yard. The porch was dimly lighted by lanterns suspended over the ice-cream tables and by lamps in the east rooms of the house. The dancing was done in the northeast room and some of the guests who were not dancing were seated in the southeast room, among them the deceased. Plaintiff in error arrived at the dance shortly before nine o'clock and was standing on the porch near the door leading from this room. Deceased and plaintiff in error were not acquainted. Shortly after nine o'clock deceased, in opening the screen door to leave the southeast room, pushed the door against plaintiff in error, who became angry and said, "You needn't try to run over us." Deceased apologized and said that he did not intend to hurt anyone. Plaintiff in error said something to the effect that he needn't get smart about it and that he needn't think he could run him away from the dance. Deceased replied that he had no intention of running anyone away. Plaintiff in error did not seem willing to accept the apologies of deceased but with much profanity said to him, "If you want anything come out in the yard and climb on and I will tend to you." Deceased replied that he was not looking for any trouble and walked away.

A few minutes later deceased returned, and as he stepped onto the porch plaintiff in error remarked to his companion, "There comes the cowardly son-of-a-bitch now." Deceased replied, "That's pretty hard to take," and as plaintiff in error stepped toward him the latter struck him with his fist over the left eye, breaking the skin slightly on his forehead and cheek. As deceased stepped back plaintiff in error drew a revolver and fired two shots at deceased, the first going wild and the second passing through his chest, in the region of the heart. Deceased fell to the floor and expired a few minutes later. Plaintiff in error walked out into the yard, took the empty cartridges from the chambers of his revolver, and as he was replacing them with loaded ones he remarked, emphasizing his remarks with a free flow of profanity, "I have come here to stay. I have shot hell out of one damned son-of-a-bitch and will get another before I leave."

Plaintiff in error testifies that he is seventeen years of age and weighs 118 pounds; that he went to school in the winter and worked on the farm in the summer; that he did not know deceased before the evening of the shooting; that he went to the dance and was standing on the porch listening to the music and watching the dancing; that he remarked to his companion that they would stand there until they ran them away; that deceased, who was standing near by, said, "No one is going to run you away;" that he replied to this that he didn't think they would, and deceased said, "You needn't get raw about it," and went out into the yard. He admits that when deceased came back to the porch he said to his companion, "There is the son-of-a-bitch," and that when he said that, deceased said, "What is this little son-of-a-bitch trying to spread around here?" and that he struck plaintiff in error with something that looked like a blackjack; that the blow staggered him backwards and knocked his cap off; that as soon as deceased struck him the former stuck his right hand in his right front pocket, and that plaintiff in error then drew his gun

and fired two shots; that he walked off the porch and met his uncle; that his uncle struck some matches and looked at his face and saw where the skin was broken and found bloody water coming from the wound; that he did not reload his gun and did not say that he was going to shoot another man before he left; that deceased was about nineteen years of age and weighed about 150 pounds; that he went to the home of one of his uncles and was there when the sheriff came to arrest him.

No two witnesses relate the occurrences of the evening in exactly the same language, but there is no substantial difference in the testimony of the great majority of the witnesses who have no special interest in the outcome of the trial. A few witnesses say that deceased appeared to have something dark in his hand when he struck plaintiff in error, but they are evidently mistaken. The wound on plaintiff in error's face was not the kind of a wound that would have been made by a blow from a blackjack but it was a superficial skin-bruise above and below the left eye that might naturally be expected to result from a blow of the fist. Deceased struck just one blow, was shot immediately, fell where he was shot and was immediately carried into the house. He had no weapon of any kind in his hand and none was found near the scene of the killing. The story of plaintiff in error himself shows that he provoked the fight by referring to deceased as he did when he came back to the porch, and there is not the slightest justification, so far as the evidence shows, for the shooting of deceased by plaintiff in error. All the evidence, fairly considered, shows that plaintiff in error was an ordinary foul-mouthed braggart with a loaded gun in his pocket, who wanted to show the bystanders that he was a "tough guy." The jury have solved the question correctly and have sent him to the penitentiary, where he belongs.

Plaintiff in error does not contend that the finding of the jury is against the weight of the evidence, but he con-

tends that the court erred in giving, refusing and modifying instructions. Counsel presented to the court eighty-eight instructions to enlighten the jury regarding the law to be applied to the facts, the prosecutor offering forty-eight, thirty-nine of which were given, and plaintiff in error offering forty, seventeen of which were given as tendered and nineteen of which were modified and given as modified. This was a gross abuse of the privilege of tendering instructions. Many of the instructions were stock instructions not applicable to the case; others were substantially duplicates; some did not state the law correctly, and still others were carelessly-drawn, argumentative instructions, which tended rather to confuse the jury than to enlighten them. This court has repeatedly condemned the practice of burdening the trial court with the labor of weeding out a lot of miscellaneous stock instructions in the short time available for this part of the trial. In *People* v. *Burns*, 300 Ill. 361, we said: "Repetition should be carefully avoided in instructions in a criminal case. Enough instructions should be given to cover the law of the case and no more. When propositions of law are repeated in different language in a number of instructions there is great danger of error, and the repetition only tends to confuse the jury."

For the People the court gave five instructions on the question of reasonable doubt. This court has often criticised this practice and has said considerable about the subject in recent opinions. (*People* v. *Moses*, 288 Ill. 281; *People* v. *Miller*, 292 id. 318; *People* v. *Sawhill*, 299 id. 393.) Instruction No. 11 is substantially the same instruction on reasonable doubt that was held bad by this court in *People* v. *Jordan*, 292 Ill. 514, and *People* v. *Andrae*, 295 id. 445. Instructions Nos. 1 and 22 were, with the change of two or three words, exact duplicates. The fact that the prosecutor tendered to the court these erroneous and duplicate instructions, so often and recently condemned in the opinions of this court, shows a lack of familiarity

with the court's decisions and with the law applicable to the case at hand.

The court gave for the People eleven instructions to enlighten the jury on the law of self-defense and seven on the subject of malice. These instructions were inaccurately drawn and many of them are subject to the criticism made by plaintiff in error. In spite of the instructions the jury gave plaintiff in error the benefit of every extenuating circumstance surrounding the killing of deceased, and he is in no position to complain of the error. No intelligent juror, acting under his oath, would.have acquitted plaintiff in error of this criminal homicide, and inasmuch as the verdict is for manslaughter, which amounts to an acquittal of the charge of murder, it is clear that plaintiff in error was not prejudiced. While there is no legitimate excuse for the prosecutor tendering to the court numerous instructions that do not state the law with reasonable accuracy, we cannot require absolute literal and technical accuracy in instructions, because such a requirement would, as a general rule, defeat the ends of justice and bring the administration of the criminal law into disrepute and just contempt. It is sufficient when the instructions, considered as a series, substantially present the law of the case fairly to the jury. Where it can be said from the record that the errors assigned could not reasonably have affected the result of the trial the judgment of the trial court should be affirmed. *People* v. *Cleminson,* 250 Ill. 135; *People* v. *Michael,* 280 id. 11; *People* v. *Haensel,* 293 id. 33; *People* v. *Lloyd,* 304 id. 23.

We have examined all of the errors assigned and argued and are convinced that plaintiff in error has had a fair trial and that the record fully justifies the verdict. The judgment of the circuit court is therefore affirmed.

*Judgment affirmed.*