(No. 18424.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FLORENCE STOKES, Plaintiff in Error.

*Opinion filed February 20, 1929—Rehearing denied April 4, 1929.*

WM. SCOTT STEWART, and HECTOR BROUILLET, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Atttorney, and ROY D. JOHNSON, (EDWARD E. WILSON, LEE R. LAROCHELLE, and JOHN HOLMAN, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Florence Stokes, herein called the defendant, was indicted by the grand jury of Cook county for the murder of James Glennon. She was found guilty of manslaughter by a jury in the criminal court of that county, and by their verdict the jury fixed her imprisonment in the penitentiary for one year. After her motions for new trial and in arrest of judgment were overruled the court entered judgment and sentenced her to the penitentiary "for a term of years not to exceed the maximum term fixed by statute for the crime whereof she stands convicted," and that she pay the costs of prosecution. She prosecutes this writ of error.

For the People four witnesses testified in substance as follows:

Winifred E. Glennon, sister of the deceased: The deceased was twenty-two years old, single, and by occupation a street car conductor. She has known the defendant three

years. The defendant called her brother on the telephone about three o'clock in the afternoon of February 22, 1927. Witness last saw him at eight o'clock P. M. on that day. When she next saw him he was dead. He never had a revolver to her knowledge. He knew the defendant about two years. She did not know how often he was with the defendant.

Morgan L. Trainor, coroner's physician: He made a post-mortem examination of James S. Glennon. Glennon had two bullet wounds in his head, on account of which, in witness' judgment, he died. One of the bullets took a downward course through the brain, through the temple bone and out below the right ear. The other bullet passed forward and downward, shattering the jaw-bone on its way out. Witness could not tell which bullet was fired first or the kind of weapon used or the caliber of the bullet.

Ralph J. McGregor, residing in an apartment building at 6450 Green street: On the night of February 22, 1927, he was sitting in the living room of the apartment and heard two shots fired in the areaway at the side of the house. He took a flash-light, looked down the stairway and saw a body lying there. He called the police. He did not see anything or hear anything except the two shots fired and did not go down-stairs. The man's heels were on a lower step and his head was "in the direction of the front of the house."

Julia Mary O'Donoghue, a resident of the apartment building at 6450 Green street: The defendant rented a room from witness some time in September and boarded and roomed with her. She saw the defendant about seven o'clock on February 22, 1927. She had not been home during that day. She did not know where the defendant had been, but she told witness that she was securing a job in Indiana Harbor. She sat in the kitchen and ate her supper, and witness saw her talking on the 'phone in the front room but did not see her after that. The defendant went

out of the apartment and has not come back since that time. She had paid her room rent for that week. She was a working girl. Since the time aforesaid she had been in the custody of the police.

Before the prosecution made its opening statement to the jury the attorney for the defendant gave notice that he would object to the introduction of the statement or confession that had been previously made by the defendant to the officers who then had her under arrest and to all evidence concerning such statement or confession, on the ground that the statement was not made voluntarily. The assistant State's attorney in charge of the prosecution agreed with the suggestion of the defendant's attorney that it would be better to have a hearing on the admissibility of the confession before proceeding with the trial, and such hearing was accordingly had in the absence of the jury. The first witness called on the hearing was the stenographer who wrote the defendant's statement or confession. He stated that when the confession was made there were present police captain Gregory Moran, officer Ed Webber and constable Charles E. Cole, of East Chicago, Indiana. Moran asked the questions and witness wrote the questions and the answers of the defendant. Witness stated that the defendant answered the questions freely and voluntarily and that no offer or inducement was made to her or any pressure brought to bear on her to get her to answer the questions and that she signed the statement when it was written. He stated on cross-examination that she had been in the captain's office fifteen minutes before he was called in and that he did not know what had taken place there during his absence. The other witness, Charles E. Cole, the Indiana constable who arrested the defendant and brought her to Chicago, testified that when he first took her in custody she refused to talk; that she did not want to be taken to the police because she was afraid she would be abused, and that he told her the police would not hurt her. He further

testified: "I told the young lady that if she would tell the truth the Chicago police would help her out, and that I was a friend of hers and would bring her in to them and she should tell the story and tell the truth, and that they would do all they could to help her out if they thought that she was giving them the evidence, and to answer any questions whatever they put to her." In response to a question as to whether anything was said to the defendant while she was in the captain's office before the stenographer came, witness said, "I think that Lieutenant Webber said that it would be best for her to make a statement and tell the truth." No other evidence was offered on such preliminary examination. The court ruled that the statement made by the defendant, which is, in fact, a confession, was admissible.

When the confession was offered on the trial it was admitted over the defendant's objection, and police sergeant Richard Piper then took the witness stand and over the objection of the defendant was permitted to testify that about 11 P. M. on February 22, 1927, their station was called and they proceeded to 6450 Green street. Other police officers arrived at the same time they did. Sergeant McFadden found the corpse. They found the body of a man lying on his face in the passageway, pretty well to the rear of the building. He was dead. Some papers in his pocket bore the name James Glennon, of 6715 Green street, and McFadden left for that number. Officer Beilfuss, who accompanied the witness, handed him two .32 caliber cartridges. The following evening, about twelve o'clock, the defendant was brought to the station in the company of a police matron, and witness talked to and questioned her. Over objection he was then allowed to testify that some papers were handed him and he looked at them and questioned her along those lines and about the death of Glennon. She stated that she had shot Glennon; that she met him at Sixty-seventh and Halsted streets in the

neighborhood of eight o'clock in the evening; that they attended a moving picture show and after the show went to the building where she roomed and entered the front hall; that Glennon then said it was too light there and suggested going around to the rear; that they went to the rear of the building and there had sexual intercourse; that after they were through she asked Glennon if it meant anything to him, and he said, "No;" that she said, "Well, then I guess I will go east;" that Glennon took a revolver from his pocket and said, "Here, this is quicker," and handed her the revolver; that she fired two shots at Glennon and then ran away; that she did not know where the gun was; that she threw it away. She also told about running away from the place where the shooting took place and going to her mother's house, where she stayed a short time and then went to Indiana Harbor, where she spent the night at the home of some friends. She told about coming to Chicago accompanied by a constable. She was questioned by several persons. McFadden and assistant State's attorney Levy questioned her and witness had her statement before him when he talked to her. "We had two or three copies of her statement." As he looked over the typewritten statement he recalled other things she told him about. She told him that she first met Glennon at the Boulevard Hall some time in the fall of the year; that shortly afterwards Glennon was gone for about a month and the young men at the dance hall told her that he was married; that she thought he was married, but when he came back he told her that she should not believe everything she heard; that she and Glennon kept company after that. Witness is familiar with fire-arms and revolvers of various kinds and with bullets and ammunition. He is also familiar with automatic pistols. He stated that the cartridges found at the body of Glennon could be used either in an automatic pistol or a revolver. The statement shown him, signed by the defendant, is in the same shape as it was when he talked to her.

The written confession of the defendant was then admitted in evidence over her objection and read to the jury. It is in the form of questions and answers and is substantially the same statement that Piper testified she made. Piper further testified, over the objection of the defendant, that he went with sergeant McFadden to the room occupied by the defendant. They found a dresser there and looked through it. They found in the top dresser drawer a circular brush for a revolver or pistol and also a memorandum book. The defendant told him that that brush was used by her to clean around the plugs and things at her switchboard and that she got it at the Chicago mail order concern where she was employed. It is the kind of brush that is used for cleaning revolvers and pistols. He also testified that the defendant told him about a notation in the memorandum book, "Go by letter that can be seen as showing F-fire; showing S-safe," and said that she had made it after reading a newspaper account about a man being shot when his gun would not work. The notation from the book was received in evidence over objection.

William F. Beilfuss testified that he was a police officer at Englewood station. He went over to where Glennon had been shot on the night of February 22. There he found Glennon's body and two empty shells, one alongside the head of the body and the other about five feet from the top of the stairway, toward the rear of the building.

Eric Standvall testified that he was mechanic and supply manager for the Chicago Mail Order Company. He knows the defendant. Over her objection he stated: "We do not carry in stock the type of brush found in Miss Stokes' room. I never furnished her any brush of that kind."

The defendant, Florence Stokes, testified that she was twenty-four years old and was born in New York and spent her childhood in an orphanage in New York City. She had been with two other families before she went with Mrs. Stokes, who took her when she was six years of age. She

stayed with Mrs. Stokes until she was eighteen years old. Mrs. Stokes was good to her and sent her to school and to business college, where she took a stenographic course. She left Mrs. Stokes because she would not let her be out at night. She first met Glennon on October 27, 1924, at Boulevard Hall, a public dance hall. She saw him sometimes twice and sometimes three times a week after they met. He promised to marry her. The first time they had sexual intercourse was in December, 1925. She had never been with any other man. After the first time she noticed a discharge and spoke to him about it. He instructed her to go to his doctor. She did so and he treated her. In her written statement she said she had gonorrhea. On February 22, 1927, she had been at Indiana Harbor with friends. While she was gone someone had called her on the telephone and she called up Glennon, who said he would meet her in forty-five minutes. They met at Sixty-seventh and Halsted streets and went to a moving picture show. After the show they walked to her home and entered the front hall. Glennon said it was too light there and suggested that they walk around to the back. They went around to the side areaway. It was dark there. He had sexual intercourse with her at the top of the stairs. After she got up she asked him if it would ever mean anything to him, and he said, "No." She then said to him, "I am going to walk east." He took a gun from his pocket and said, "This is quicker." She then took the gun and pointed it at her head and he grabbed it from her. They sat down on the steps again, and she told him that if she thought he was not going to marry her after all she had gone through for him she would die. She told him that she heard he was trying to make a fool out of her but she did not realize it until then, and that if she had known he was not going to marry her she would never have given in to him. He asked her if she could not take a joke, and she said not that kind of a joke. He said that she was three

times seven. Then he put his arms around her and she pushed him away. Then he pulled her head down and it struck the wall, and she tried to push him away with her hand. She tried to bite his hand. He was holding her tight and swore at her, and then when he was pulling her around her hand struck the revolver and she grabbed it. They got up together. He made a grab for the gun and missed it and turned. Just as he turned she fired. She thinks she fired once. Then she ran away. She had never seen the revolver before. She had seen Glennon with a revolver several times. One time he had an automatic pistol, which he was going to give her. He gave it to her and she gave it back to him. At the same time he gave her some cartridges. She did not give them back to him but kept them in a little wooden box. He did not give her the round wire brush. She got that of the Chicago Mail Order Company. She used it for cleaning between the keys of her switchboard.

William F. Beilfuss testified for the defense that at the time he found Glennon's body his trousers were open. He found them open after he got the body to the undertakers.

Richard Piper testified for the defense that the twelve cartridges found in the match-box are .32 caliber Remington cartridges. They are for an automatic pistol. They are not like the .32 caliber shells found at the body. They are marked differently and are made by a different manufacturer.

Richard J. Glennon and William A. Glennon, brothers of the deceased, and Robert Nye and Walter Ring, friends of the deceased, in rebuttal testified for the State that they had never known of deceased having or carrying a gun or fire-arm of any kind.

The search and seizure made by the police officers in defendant's room was made without a search warrant and out of the presence of the defendant and without her consent. The entire testimony concerning the articles of property

found in her premises, and the memorandum in the handwriting of defendant found in her memorandum book, and her cross-examination concerning the same, was incompetent, and the court erred in overruling the objections thereto and admitting the same. Before the trial the defendant filed her motion alleging that the articles aforesaid had been illegally seized and that the State's attorney intended to introduce them in evidence, and prayed that the evidence concerning the same might be suppressed. The court overruled the motion. The search and the seizure of defendant's effects were in violation of her constitutional rights as defined in section 6 of article 2 of the constitution of 1870. (*People* v. *Brocamp,* 307 Ill. 448; *People* v. *Castree,* 311 id. 392; *Agnello* v. *United States,* 269 U. S. 20, 46 Sup. Ct. 4.) The *Agnello case* is cited in support of the proposition that the cross-examination of the defendant concerning the articles seized is inadmissible, as that decision is under the fourth amendment of the Federal constitution, which article contains the same provisions as are found in section 6 of our constitution, from which amendment section 6 was taken.

The court also erred in overruling the defendant's objection to the admittance of defendant's confession, for the reason that the same was obtained from her under a promise that it would inure to her benefit in her trial for the offense for which she was arrested and to be tried. This court in *People* v. *Heide,* 302 Ill. 624, held that a confession obtained under any promise or hope of immunity is not admissible in evidence against an accused in a criminal case, and there are many other decisions in this State and in other States of the United States to the same effect.

The testimony of the defendant, together with the competent testimony in the record of the State's witnesses, shows clearly and beyond all reasonable doubt that defendant is guilty of the crime for which she is convicted. The record also shows that the jury was not prejudiced against the defendant by reason of the incompetent testimony.

This is shown by the fact that the jury found her guilty of manslaughter and not guilty of murder and fixed her penalty at imprisonment in the penitentiary for the term of one year. The jury, as a matter of fact, had no right to fix the penalty for manslaughter, but that part of their verdict which attempts to fix the term of imprisonment may be, and was, rejected by the lower court as surplusage under the authority of *People* v. *Coleman,* 251 Ill. 497. Nevertheless, the verdict, while a good verdict for manslaughter, shows clearly that the jury could not have been prejudiced against the defendant.

The defendant complains that certain instructions offered by the People were erroneous and that the court erred in refusing to give other instructions that were offered by the defendant. These alleged errors may be disposed of, and we do dispose of them, in like manner as we did the errors aforesaid, by simply holding that it is clearly evident that the defendant was not prejudiced by the giving or refusing of instructions. This court has held in many cases that where it can be said from the record that the errors assigned could not reasonably have affected the result of the trial the judgment of the trial court should be affirmed, and that a judgment in such case should not be reversed and the cause remanded so that a better record may be made on another trial. (*People* v. *Heard,* 305 Ill. 319; *People* v. *Halpin,* 276 id. 363; *People* v. *Cleminson,* 250 id. 135.) The defendant has gone on record and has given her testimony in court voluntarily, and no good purpose could be served by a reversal of the judgment and a remandment of the cause. She could not hope for a disposition of the case more favorable to her, as her testimony in court would be admissible against her even though she should refuse to testify in a subsequent trial.

For the reasons aforesaid the judgment of the criminal court is affirmed.

*Judgment affirmed.*