(No. 22215.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN H. ROONEY *et al.* Plaintiffs in Error.

*Opinion filed February 23, 1934—Rehearing denied April 10, 1934.*

614

Wм. Scott Stewart, for plaintiffs in error.

Otto Kerner, Attorney General, Thomas J. Courtney, State's Attorney, and J. J. Neiger, (Edward E. Wilson, J. Albert Woll, and Henry E. Seyfarth, of counsel,) for the People.

Mr. Justice Stone delivered the opinion of the court:

Plaintiffs in error were found guilty in the criminal court of Cook county of the murder of one Stanley Gross, a watchman employed by the firm of Goldblatt Brothers. Plaintiffs in error John H. Rooney and Henry P. Berry were sentenced to the penitentiary for life and plaintiff in error Rosalie Rizzo was sentenced to twenty years' imprisonment therein. One John Jilson and one Herbert Arnold were likewise indicted with plaintiffs in error for this murder but were not apprehended.

About 3:00 o'clock in the morning of May 23, 1933, Stanley Gross, while seated in an automobile in front of Goldblatt Brothers' store on Chicago avenue, in the city of Chicago, was killed by bullets fired from a passing auto-

mobile. Gross' companion was Edwin Wilcox, who testified in substance as follows: He (Wilcox) was on the front seat of the automobile and Gross was on the back seat. They had been employed by Goldblatt to watch for window breakers. · About 3 :00 o'clock he heard a shot and dropped to the floor of the car. As he did so he saw what he thought was a dark, maroon-colored coupe, with a white line running along under the windows, driven rapidly past them. As the car went by, the driver appeared to be firing a gun over his shoulder. One Charles McDowell, a watchman, testified that about 3 :00 o'clock on that morning he saw a dark coupe coming from the direction of Goldblatt's and making a turn south onto Paulina street at a high rate of speed, and that he could see two faces in the coupe. Roman Thial testified that he saw the car drive by and that he thought it was a black sedan.

Edward McGowan, a detective, testified that his beat lay on Washington and Madison streets, and included the headquarters of the Circular Distributors Union, located at 79 North Racine avenue; that in pursuance of his duties he went hourly during the night to the union headquarters; that on this night he first went there at 7 :00 o'clock; that he first saw Rooney and Berry, whom he pointed out in the court room, at the headquarters about 10 :00 o'clock, and at 11 :00 o'clock, when he again visited the headquarters, he again saw Rooney and Berry. He further testified in substance: Rooney introduced Alex Davidson to him and said that Davidson was going to take care of the place from that time on. At midnight he saw Rooney and Berry and a woman with another man at the headquarters. This man and woman were drinking at the bar. He did not see her in the court room. During his visits at 1 :00 o'clock and at 2 :00 o'clock Rooney and Berry were there. He saw Alex Davidson there after midnight but did not know just what hour. Rooney and Berry were at the headquarters when he again appeared at 4 :00 o'clock in the

morning and both had been drinking. He testified that his stays at the headquarters were brief—not over five or ten minutes.

Alex Davidson testified that he was a member of the Circular Distributors Union and on the morning of May 22 went to the headquarters about 10:00 o'clock and remained there until the next morning. He further testified in substance as follows: Berry came to the headquarters about 5:00 o'clock that afternoon. Rooney was there and they began drinking at the bar. Until about 9:30 a number of persons were there, but by that time all had left except Rooney, Berry and himself. A man and woman came in later and remained at the bar, drinking, until about midnight. Rooney told the witness that he figured there were some men from the State's attorney's office in a room on the third floor of the building across the way watching the union headquarters, and asked the witness to walk around the building and see if a Packard car was parked there and whether a window on the third floor of the building was vacant. Witness did so, and on his return reported that the window was open but he could see no car. About 9:30 Rooney asked him to go and buy him a pair of field glasses, and he went to Fogel's pawnshop, on Madison street, and purchased a pair of field glasses and brought them to Rooney, who went to the window and looked through the glasses at the window across the street but was unable to see clearly because of the darkness. Rooney cursed Goldblatt for having the police from the State's attorney's office up there, and said, "Damn them, I will get even with them." Some time before 2:00 o'clock Rooney asked witness to go out and make a long distance telephone call and gave him a number, Berwyn 2981, and told him to forget the number after he had called it. The witness left the building and went to a telephone about a half block away. He called Berwyn 2981 and asked the party who answered if it was Rose, and she asked him

who was calling. He identified himself by a circumstance which he detailed in his testimony and which they both remembered, and she asked him what was wanted. He replied, "Johnny told me to tell you to bring your car and an extra one and park the car a half block away from the union hall on Racine avenue," to which she replied, "All right; I will do that." The witness further testified in substance: He (the witness) returned to headquarters and told Rooney what he had done, and Rooney told him to forget about it. Rosalie Rizzo came to the union headquarters about forty-five minutes later and Rooney let her in. Before she arrived, Rooney and Berry were drinking and talking about going over to Goldblatt's and scaring the people there. When Rizzo came in Rooney said, "Did you bring it?" and she replied, "Yes." She had a big pocket-book, from which she took a gun and handed it to Rooney, and he handed it back to her with another gun which he took from his pocket and she put them in her pocket-book. He said, "Never mind that; we have work to do." Earlier in the evening witness had seen the gun which Rooney gave Rizzo. It was in Rooney's possession. When Rooney went to the window with the field glasses he said he was going to throw a couple of slugs at the window, and witness told him he thought it was foolish, because whoever was there would know where they came from, to which Rooney replied, "You are right," and put the gun back. When Rizzo arrived Berry was dozing at the bar, and Rooney said to him, "Come on, Hogan; we have work to do," and they started down-stairs. Rizzo said, "I am going with you," to which Rooney replied, "You stay where you are at." She said, "No, I have gone with you other times too," and he said, "Well, come on." The three then walked down the stairs. Rooney had told Rizzo that she should take his car and scout around Goldblatt's to see if the coast was clear while he was going for the other car. Witness saw Rooney's car parked across the street from the head-

quarters. He saw it pull away after they left the head-quarters, with Rizzo driving. Berry and Rooney walked up Racine avenue and got into a Plymouth coupe standing about a half block from the union headquarters and drove away. They returned about 3:00 o'clock, having been gone fifteen or twenty minutes. Witness went down-stairs and opened the door and let them in. Rooney and Berry came in first and Rizzo ran across the street from where she had parked Rooney's car. Rooney returned to Rizzo the gun which she had brought and told her to take the Plymouth back and ditch the gun, and she then left. After they had gone up-stairs to the headquarters Rooney said, "You ought to see the way he keeled over; I let him have it." Witness asked him who it was, and he said it was the guard. Berry said, "You ought to see the way he let him have it." Rooney then told witness that if anybody came up and asked whether he (Rooney) had left the head-quarters, witness should say that he had not, and that wit-ness replied, "All right; I will do that, Johnny." Rooney and Berry remained at the headquarters the balance of the night. When Berry left, about 7:00 o'clock, he was very much intoxicated and a cab was called to take him home. Rooney left the headquarters about 10:00 o'clock, and after that the witness did not see him around there, although prior to May 23 he was there almost every day. Berry came back to the headquarters that afternoon and was still intoxicated and said to the witness, "If anybody wants to know if I was up here, you say I wasn't here," to which witness replied, "All right." Witness saw Berry three or four times after that, and Berry told him to stick to the same story he had given him—that he was not up there the night it happened. This witness also testified that at 1:00 o'clock in the morning of the shooting Berry told him to go down to the building where the men from the State's attorney's office were and throw a brick through the win-dow, and that the witness told him he was crazy and that

he would not do it, and that Berry left the headquarters and returned in a short time, saying that he broke the plate glass window in the store underneath the window of the room in which the men from the State's attorney's office were. He also testified that when Rizzo came to the headquarters she talked with Rooney about being intoxicated, and that Rooney told her he was going to Goldblatt's and throw a couple of slugs at the window and throw a couple of slugs at the watchmen and scare them, because Goldblatt was causing him a lot of trouble, calling men from the State's attorney's office.

Joseph Goldblatt, vice-president of the Goldblatt Department Store, testified in substance: He first met Rooney in September, 1930, when he came to his office. They discussed the pay of the men and what each man should pay to the union. Rooney returned about a week later and said that if witness did not organize the men in his store into unions they would have to put posters on their bills saying their store was unfair to organized labor, and that witness told him most of the workers in his store belonged to unions. A few days later pickets were placed at the store carrying banners indicating that the store was unfair to organized labor. A few days later Rooney came to the office of the witness and told him that for $5000 the store would not be bothered any more. They finally agreed on a payment of $1300, with the understanding that the store would not be bothered for one year. Witness paid Rooney $1500 "for good measure." This payment was made at about a quarter to 4:00 that afternoon and at 4:00 o'clock the pickets were taken off. Witness saw Rooney again in the early part of September, 1931. They talked again about an agreement, and the next day he directed his office to pay Rooney $1800, and no pickets were returned to the place. He further testified in substance: In May, 1932, Rooney again came to witness' office and he refused to give him any more money, and pickets were

again put in front of his store. After they had been there about five or six days witness went to the State's attorney's office and complained, and the pickets were taken off. A few days later a couple of windows of the store were smashed and merchandise had been slit with a knife of some sort. In April, 1932, a man named Leonard Boltz, who said he was Rooney's representative, visited witness and demanded money, which was refused. A day or two later stench bombs were thrown into the bakery and windows of the store were broken. In all about twenty stench bombs were thrown into the store.

Peter Wisiolowski, a police officer, testified that in April, 1932, while on duty near Goldblatt's store, he heard a window crash and saw a hole in a plate glass window in the front of the Goldblatt store; that a Buick automobile went by and he called to the men in it to stop, and that he recognized Berry on the running-board. Witness pointed out Berry in the court room.

Leo Fogel, the keeper of the pawnshop where Davidson testified. he had purchased the field glasses on the evening before the shooting, was sworn a witness and identified Davidson and the bill of sale he signed that evening for the glasses. One Joseph Cannon, a clerk in Fogel's pawnshop, testified that he made out the bill of sale at the request of Fogel.

The State also proved from the records of the telephone company that a call was made from Haymarket 9803 to Berwyn 2981 at 12:43 A. M. on May 23; that the former of these telephones is in a booth at 1133 West Madison street, and that the Berwyn number was located at 6348 West Thirteenth street, Berwyn, and that there was but one call between these stations that night. It was shown that the contract for the Berwyn telephone was signed, "Donald Riggs, by Rose Riggs." The State also introduced the testimony of one Charles Pribyl, a police officer, who testified that he went to Rizzo's apartment and looked

at the telephone number; that it was Berwyn 2981; that he looked in the garage at the home of Rizzo's parents, and there he saw a 1932 Plymouth coupe, dark blue in color, with a white stripe around the car just below the windows.

Plaintiffs in error took the stand and denied the testimony offered against them. Rooney admitted that Davidson was at the union headquarters all of the night of May 23. He denied that he sent Davidson to buy the field glasses, but stated that he redeemed a pair of field glasses that night for a friend. He admitted, however, that he had stated at the police station that he owned the field glasses. A series of questions was put to him concerning a conversation between him and an investigator of the State's attorney's office. He denied that he had made such statements or that the questions detailed were put to him at that time. Rebuttal evidence was offered to show that such questions were asked and answered by him as indicated in the questions to him. Berry admitted he was at the headquarters from about 7:30 in the evening to about 7:00 o'clock the next morning and that Davidson was in while he was there. Each of the accused denied having had anything to do with the shooting and denied *in toto* the testimony of Davidson regarding their actions that night. Rizzo denied that she went to the union headquarters on that night or that she took a gun to Rooney, and denied that she loaned a car to anyone or that she was in the vicinity of Goldblatt's during that night.

Eighteen assignments of error have been attached to the record. Those argued may be put under the following heads: (1) The court erred in the admission and exclusion of evidence and giving instructions; and (2) the State's attorney made improper argument to the jury.

Before the trial of the case plaintiffs in error moved to quash the indictment, and their motion was overruled. This ruling was assigned as error, but as the point is not argued here it is deemed to have been waived.

Plaintiffs in error earnestly argue that it was error to admit the testimony of Joseph Goldblatt concerning conversations and dealings which he had with plaintiff in error Rooney, for the reason that it was evidence of distinct and independent offenses having nothing to do with the crime charged; and that such evidence was inadmissible also for the reason that Berry and Rizzo were not shown to be in any way connected with Rooney or the union and not shown to have any part in these offenses to which the evidence related. In support of this contention they rely upon *Farris* v. *People,* 129 Ill. 521, *People* v. *Rongetti,* 338 id. 56, and *People* v. *Heffernan,* 312 id. 66. In the *Farris case* the evidence concerned the commission of a crime other than the one for which Farris was on trial and which was committed after the murder with which he was charged. It was held that evidence of that crime had nothing to do with the murder and was of a nature which in all probability prejudicially influenced the jury, and the judgment was reversed. In the *Rongetti case* the charge was murder by abortion. A motion was made to strike testimony of a witness that she had seen the accused perform similar operations. This court there held that the witness should have been required to give such details of the operations to which she referred as to enable the court to judge whether they tended to show guilty intent. In *People* v. *Heffernan, supra,* the evidence objected to concerned separate and distinct robberies in no way connected with the crime charged. The applicable rule of evidence is, that if the evidence offered has a tendency to identify the accused as the perpetrator of the crime charged, or show his presence at the scene of the crime where an alibi is interposed, or tends to prove a common design, motive or conspiracy out of which the crime charged arose or with which it is connected, such evidence is admissible though it may also prove the commission of separate and distinct offenses by the accused. (*People* v. *Lenhardt,* 340 Ill. 538; *Peo-*

*ple* v. *Cummings,* 338 id. 636; *People* v. *Mandrell,* 306 id. 413; *People* v. *Hall,* 308 id. 198.) It is clear that the testimony complained of was offered for the purpose of showing, and that it tended to show, motive for the act charged and a common combination and design leading up to the crime. The presence of a motive which would lead the accused to commit the act charged is important in the consideration of his guilt or innocence, and it is always proper to prove motive when it can be done. (*People* v. *Watkins,* 309 Ill. 318; *People* v. *Zammuto,* 280 id. 225.) Evidence of other crimes is generally competent to prove the specific crime when it tends to establish motive or a common design or plan, or where the commission of such other crimes is so related to the crime charged that proof of them tends to establish the charge or to identify the accused with the commission of the crime charged. (*People* v. *Cione,* 293 Ill. 321.) The evidence of Goldblatt tends to show a joint purpose or conspiracy on the part of plaintiffs in error to terrorize the Goldblatts into paying tribute. All persons who enter into a conspiracy become chargeable with all the means used to carry it out, (*People* v. *Walczak,* 315 Ill. 49; *Cooke* v. *People,* 231 id. 9;) and the acts and declarations of all are admissible. (*People* v. *Raymond,* 296 Ill. 599.) It was not error to receive Joseph Goldblatt's testimony.

It is contended that the court erred in admitting in evidence a photostatic copy of the receipt given by Fogel for the price of the field glasses, for the reason that the original of such photostatic copy was illegally seized in Rizzo's apartment and a motion had been made to suppress it as evidence and confessed. Rizzo's counsel says that when motion was made to suppress as evidence this receipt and other articles the State's attorney confessed the motion, and stated that the articles named, including the receipt, would not be used, but that a photostatic copy of the receipt was put in evidence, and the police officers who raided

Rizzo's apartment described the original and testified to finding it in a dresser drawer in that apartment. The officers testified that they had no search warrant when they visited Rizzo's apartment, and that they got a pass-key from the owner of the apartment who had rented it to Rizzo and went in. When the motion to suppress was filed the State's attorney agreed that it should be sustained and that none of the articles there would be used in evidence or testimony offered concerning them. The introduction of this copy of the receipt was not only contrary to the statement of the State's attorney that it would not be used, but the original having been obtained by an unlawful search and seizure the People were not entitled to have a copy in evidence. (*People* v. *Stokes,* 334 Ill. 200.) It was error to admit this exhibit in evidence. Rizzo admitted that she had known Rooney for six years. She was arrested with him in a cottage in Wisconsin. It is shown that Davidson called her by telephone on the night of the murder. While this court condemns the conduct of the State's attorney in that behalf and such conduct would in a close case work a reversal of the judgment, yet in this case the exhibit tended only to show the relationship between Rizzo and Rooney, and its admission did not amount to prejudicial error.

It is earnestly urged that the testimony concerning the conversation of Rooney, Berry and Rizzo at the headquarters was especially prejudicial in that it detailed Rizzo's statement that she had gone with Rooney at other times, and that he had said, "Well, come on." A motion was made to strike this testimony, which was overruled. Counsel cites in support of his contention that it was error to refuse to strike this evidence, the case of *Anson* v. *People,* 148 Ill. 494. In that case the charge was forgery, and evidence was admitted of statements made by the defendants referring to other forgeries. It was held that the failure to produce such instruments made the statement of their

admission for the purpose of showing intent erroneous. In this case Davidson's testimony related what was said in his presence. It was competent as a part of the conversation of plaintiffs in error and as tending to show the relationship of Rizzo with Rooney and Berry.

Plaintiffs in error contend they were unduly restricted in the cross-examination of Davidson. We have examined the testimony as to the particulars complained of, but find no instance where plaintiffs in error's counsel was not permitted to procure an answer to a material question.

Numerous other errors are assigned, principal among which is that the plaintiffs in error were not proved guilty beyond a reasonable doubt. We have examined this large record, and while the State's case depends largely upon the testimony of Davidson, who plaintiffs in error say is an accomplice, his testimony is corroborated in material particulars, as indicated in the analysis of the testimony hereinbefore made.

Other objections are raised and we have considered them. We do not deem them of sufficient importance to unduly extend this opinion by discussing them.

Errors in instructions are assigned. One is that it was error to give four instructions defining malice. While these instructions might have been combined into one, they were not duplications but define the various phases of malice. They do not direct a verdict. It was not error to give them.

It is also argued that the court, in instructing the jury with reference to the testimony of an accomplice, did not by instruction 22 fully inform the jury as to the law on that subject. The omission, however, was supplied by People's instruction 28. The jury were also told to take the instructions as a series and to consider each with other instructions bearing upon the same subject.

We have examined other instructions complained of and find no error therein.

Objection is also made to the argument of counsel on the ground that by calling the accused "drunken, rough-riding, racketeering hoodlums," and referring to Rizzo as "the woman who rode with her hoodlum mate," he appealed to the passion and prejudice of the jury. There was evidence in the record tending to support this excoriation. It is not error to denounce the accused where there is testimony tending to support the State's attorney's characterization of him. *Crocker* v. *People,* 213 Ill. 287.

We are of the opinion that there is no prejudicial error in the record requiring reversal.

The judgment is affirmed. *Judgment affirmed.*