(No. 30873.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT SMITH, Plaintiff in Error.

*Opinion filed Sept. 22, 1949—Rehearing denied November 21, 1949.*

126

Meyer & Meyer, of East St. Louis, M. C. Cook, of Du Quoin, and J. E. Fleming, of Belleville, (James Campbell, of East St. Louis, of counsel,) for plaintiff in error.

George F. Barrett, Attorney General, of Springfield, and Louis P. Zerweck, State's Attorney, of Belleville, for the People.

Mr. Justice Daily delivered the opinion of the court:

Plaintiff in error, Robert Smith, hereinafter referred to as defendant, was tried in the circuit court of St. Clair County on an indictment charging him with the murder of William North. A jury found him guilty of manslaughter and the court entered judgment sentencing him to the penitentiary for a term of not less than one nor more than fourteen years. He now seeks a reversal of the judgment on the ground that the evidence does not sup-

port the verdict, that counsel for the People committed error in his closing argument to the jury, and that errors were committed on the trial in the admission and exclusion of testimony and in instructions given to the jury.

Defendant and deceased were both employees of the O.K. coal mine at Marissa, Illinois, which was operated by George Smith, a brother of defendant. Defendant occupied the position of purchasing agent and in addition was described as "night resident maintenance watchman." North was employed in a mining capacity and also was a member of the mine safety committee. The record shows that the two men had at various times verbally disagreed over the mine operation and North's manner of working, but neither had manifested any threats or acts of violence against the other. On March 29, 1947, the mine was closed down; however, the office force was operating, as was a machinery repair crew. North was a member of this crew but failed to appear for work. Defendant was not at the O.K. mine during that day but was working at another mine five miles away. Evidence introduced by the defense indicates that North came to the mine about 8:00 A.M. seeking George Smith, but Smith was not there. North returned about 10:00 A.M. and engaged the repair crew in a conversation during which he stated that he was not working "because he had other fish to fry," and that he was going to "run Robert Smith and his son Press away from the mine." North next appeared in the mine office about 11:00 A.M. where he approached George Smith and demanded payment of four hours' wages he thought was due him. When Smith refused North uttered threats to the effect that the mine would not operate another day and that he intended to run the Smiths and their "stooges" away from the property if he had to kill them to do it. Smith and his three office employees corroborated each other on this phase of the testimony. North was then ordered to leave the premises and told not to return until

he was sober and able to work. This is the only intimation in the record that North was intoxicated at the time, although a witness who saw him in a tavern later in the afternoon stated that North appeared to have been drinking intoxicants.

George Smith testified that as a result of North's threats he telephoned defendant and told him to stay away from the O.K. mine until 5:30 P.M. Defendant's version of this warning was that it was sent to him through his son-in-law. In any event, defendant returned to the mine around 4:30 P.M. It appears that defendant's duties as "night resident maintenance watchman" required him to do the janitor work in the office and to remain on the premises usually from 4:00 P.M. till 6:00 P.M. when he was relieved by a regularly employed night watchman.

The office building was so constructed that there was a small anteroom outside the front door, which door had a window in it through which the men were paid. The door opened into a large room which contained desks and other office equipment. Immediately off the large room was a small room equipped as living quarters and which was referred to several times as defendant's apartment and living quarters. At 6:30 P.M. on the night of March 29, after Johnson, the night watchman, had arrived, and while defendant was finishing his janitor duties, North returned to the premises.

Johnson, who appeared as a witness for the People, testified that when North arrived, defendant, who was working in the areaway at the front door, told North to "get back in his car; that he had no business out there;" that North kept coming and profanely stated that he would come in the office whenever he pleased. At this, defendant stepped into the office, entered the living quarters and returned almost immediately. North in the meantime had stepped into the office. The witness stated that when defendant returned from the living quarters, North walked

toward defendant and started to attack him, reaching back with his left hand as he did so; that defendant thereupon aimed a gun at North; that North stepped back outside the front door when he saw the gun and had just started to turn to go away when defendant fired two shots; that after the two shots were fired North ran around the corner of the building. Johnson further testified that defendant followed North around the building and that he heard another shot fired but did not see it. Immediately thereafter North ran inside the building, where he collapsed. On cross-examination Johnson stated that he did not see a weapon in the deceased's hand, and that he did not see him hit or strike the defendant or make any effort to do so. Law-enforcement officers told of finding North's dead body inside the office, and established that no weapons were found on the deceased. A medical witness testified that his examination of the body indicated that death was caused by a bullet which entered the deceased's back under the left clavicle, and expressed an opinion that the deceased could have lived only a few minutes after receiving the wound.

Defendant, testifying in his own behalf, stated that when he admonished North not to enter the office the latter's reply was: "I will come into that office any time I —— —— please and I will just come in there now and take you out;" that these words caused him to become nervous and "scared to death," and that he rushed to the drawer where a pistol was kept and seized it, not knowing whether it was loaded or unloaded. He then said to North, who had entered the office door, "Bill, if you come into this office, I will kill you, so help me God." He testified that North laughed and continued to walk toward him and "done this" (just what is not clearly shown,) whereupon defendant fired one shot. On redirect examination he stated that deceased had turned and reached with his left hand to his hip pocket just as the first shot was fired. He

could not clearly remember having fired a second shot, but stated that after the first shot North turned and ran from the office. He denied that North had stepped out of the office or turned his back before the first shot was fired. Defendant further testified that he went out the door to see where North had gone; that he did not follow him around the building but stood by deceased's car in front of the building looking for him. While there he heard a noise and involuntarily fired the gun again, but at no particular target. Defendant then told of returning to the office and of finding North's body on the floor at the door of the living quarters, following which he caused a doctor, an ambulance and the sheriff to be summoned. Defendant professed to have no familiarity with firearms and testified that the gun he used was one which had been left in the office, presumably by a former operator of the mine. Several witnesses testified to defendant's good character and reputation as a peaceful and law-abiding citizen.

During his examination, defendant testified that the deputy sheriff, on arriving at the scene of the shooting, exclaimed, "I knew this was going to happen," and told defendant, "You can put the gun away now, nobody will bother you." When called in rebuttal the deputy denied having made the statements. The coat of the deceased with a bullet hole in the back was also introduced in rebuttal of defendant's testimony that North had not turned his back to him. Other evidence introduced in rebuttal sought to establish that the deceased was right-handed, but witnesses on surrebuttal insisted that he was left-handed.

Defendant contends that the foregoing evidence indicates that he is not guilty of murder or manslaughter, and that the homicide was justifiable as being in defense of his person and of his habitation. Whether the killing of one person by another occurred under circumstances which justified the act under the doctrine of self-defense, or was the result of some other motive is a question of fact to be

determined by the jury, under proper instructions, from a consideration of the evidence. (*People* v. *Jones,* 312 Ill. 190; *Foster* v. *Shepherd,* 258 Ill. 164.) On review this court will not disturb a verdict of guilty on the ground that the evidence is not sufficient to convict unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to justify entertaining a reasonable doubt of defendant's guilt. (*People* v. *Rudnicki,* 394 Ill. 351; *People* v. *Holt,* 398 Ill. 606.) In the present case the evidence on the question of self-defense is in conflict. The People's witness, Johnson, testified that the deceased was turning away and retreating from inside the office at the time defendant fired the first two shots. Defendant testified that his first shot was fired inside the office while deceased was advancing toward him in a threatening manner, but such testimony is rebutted by the fact that deceased was shot in his back. Johnson also testified that North "started to attack" the defendant and reached to his rear pocket with his left hand. On cross-examination he was unable to give any details of the attack and admitted that he did not see a weapon in deceased's hand, and that deceased did not hit or strike defendant or make any attempt to do so. Defendant's testimony of an attack was limited to a statement that deceased advanced on him and reached his left hand to a back pocket as he did so. It is unascertainable from the evidence which of the three shots fired caused the fatal wound, and, from the medical testimony, it might have well been that the third shot, which was fired while deceased was in full retreat, was the fatal shot. It was for the jury to determine the credibility of the various witnesses and to attach such weight to their testimony as it thought it was entitled to. The jury accepted the testimony of the People as being the correct version of what happened. The juror's acceptance of the People's theory leaves nothing for this court to determine except whether there is sufficient evidence, if believed to be true, to prove

defendant's guilt beyond a reasonable doubt. While deceased did utter threats against defendant, there is uncertainty in the evidence as to whether he made an assault before he retreated from defendant's gun, and serious question is raised as to the necessity of such a severe assault on the part of defendant. We are of the opinion that the latter's guilt was established beyond a reasonable doubt, and that the jury was justified in concluding that defendant was not motivated solely by a necessity, or apparent necessity, of self-defense.

Defendant next urges that the shooting occurred in defense of his habitation, and was thus justifiable. The evidence shows that defendant did, on many nights, sleep in the living quarters at the mine office, however it is equally clear that he was not the night watchman as described, because another was hired for that purpose. It was also brought out that defendant owned and maintained a home for his family at Du Quoin. Defendant has cited numerous cases wherein this court has reviewed the force with which a man may defend against one forcibly entering his home, but we are of the opinion that the doctrine has no application here. The building which deceased sought to enter was a public office, which was open, and in which defendant, one of the mine officials, was present. There is no evidence that deceased sought to make a forcible entry into defendant's living quarters. With these facts in mind, it is difficult to concede that the office or the living quarters here were imbued with the sanctity which has motivated the holdings that a person may forcibly defend his dwelling against an unlawful entry by one whose purpose is to assault or offer violence to him. This court pointed out in the early case of *Davison* v. *People,* 90 Ill. 221, that a person is not justified in the taking of human life to prevent a mere trespass to his real estate or property, except in the case of his dwelling house, which he may defend even to the taking of life, if necessary, or apparently neces-

sary, to prevent persons from forcibly entering it against his will, the law allowing ample redress for other trespasses to real estate. In addition, the finding of the jury in the present case that deceased did not assault or attempt to assault the accused, makes such defense inapplicable.

The next error assigned by defendant is that the trial court erred in the admission and exclusion of evidence, yet he has failed to point out the alleged errors either in his assignment of error or in his brief and argument. Unless counsel in the original brief point out or argue specifically the trial court's error, it is no part of the duty of this court to enter upon an independent investigation in order to furnish material on which to base a reversal. (*Welsh* v. *Shumway*, 232 Ill. 54.) Defendant is deemed to have waived this assignment of error by his failure to point out and argue the specific errors complained of.

It is next contended that the State's Attorney made improper and inflammatory remarks in his argument to the jury. The abstract contains no reference to the argument of counsel except that contained in an affidavit attached to defendant's amended motion for a new trial, wherein the remarks complained of are set forth. We note that such affidavit was made by defendant's counsel two months after the oral arguments were made. It has long been the rule that alleged unfair arguments and improper conduct on the part of a State's Attorney or his assistants should be contained in the bill of exceptions to be preserved for review, and it is not sufficient that they are shown in an affidavit in support of a motion for a new trial. (*People* v. *McDonald*, 365 Ill. 233; *People* v. *Ladas*, 374 Ill. 419; *People* v. *Ritcheson*, 396 Ill. 146.) The questions urged in reference to arguments of counsel are not properly preserved for review and, therefore, cannot be considered.

Lastly, defendant complains of instructions Nos. 2, 5, 7, 8, 9 and 11 given to the jury on behalf of the People.

Instruction No. 2 told the jurors what constituted self-defense as a matter of law. The objection is that the instruction fails to say that the danger to defendant need not be real but only apparent. A reading of the instruction does not support such contention, for it says, in part: "The court instructs the jury, that, as a matter of law, if a person kill another in self-defense, *it must appear to the defendant,* as a reasonable person, that the danger was so urgent and pressing that in order to save his own life or prevent his receiving great bodily injury the killing of the other was absolutely necessary *or apparently necessary."* etc., (italics ours.) The instruction clearly says that a defendant has the right to kill in self-defense if confronted with danger apparent to him, acting as a reasonable person. Instruction No. 5 given on behalf of defendant also stated that defendant had the right to self-defense "whether the danger was real or apparently real." An instruction similar to the one complained of was upheld by this court in *People* v. *Priddy,* 327 Ill. 59. We must conclude that the jury was amply and correctly instructed in the foregoing matter.

People's instruction No. 5, which instructed the jury as to "malice aforethought" concluded as follows: "* * * is murder under the laws of this State, provided the jury further believes, from the evidence, beyond a reasonable doubt, that no circumstances exist excusing or justifying the act or mitigating it so as to make it manslaughter." It is urged that this language tells the jury that if the killing were justified it would be manslaughter, whereas the law is that if the killing was justified the jury should have returned a verdict of not guilty. From our reading of the instruction, we are of the opinion that the language therein is not susceptible to the attack of defendant. In any event, the jury was adequately and correctly instructed by other instructions on the law pertaining both to justifiable homi-

cide and manslaughter. When all instructions are read as a series, it is not material that one of the instructions, standing alone, might have misled the jury. (*People* v. *Scimeni*, 316 Ill. 591.) Further, the instruction complained of does not purport to state the whole law applicable to the case and to direct a verdict.

Instructions 7 and 8 are attacked on the ground that they are repetitions of other instructions given. Without going into the content of the instructions involved, suffice it to say that we have on numerous occasions stated that while repetition should be avoided in instructions, (*People* v. *Burns*, 300 Ill. 361; *People* v. *Heard*, 305 Ill. 319; *People* v. *Rooney*, 355 Ill. 613; *People* v. *Rife*, 382 Ill. 588,) and is not approved, it is not alone sufficient to reverse judgment. (*People* v. *Vaughn*, 390 Ill. 360.) Instruction No. 8, which defines justifiable homicide, is also attacked on the ground that it says that fear exercised by the person committing the homicide need only be the "fear of a reasonable person," whereas defendant contends the requirement of the law is that the fear "need only be apparent." From our previous discussion of People's instruction No. 2, and defendant's instruction No. 5, it may be seen that the jury was correctly instructed as to the element of fear, where defendant sought to justify the homicide on the grounds of self-defense. When considered with these instructions, No. 8 is not subject to defendant's objection.

Defendant's objection to instruction No. 9 is the same as met our consideration in *People* v. *Ritcheson*, 396 Ill. 146, wherein we stated: "It is well settled that a court may instruct a jury that it is not necessary to prove every incriminating fact or circumstance beyond a reasonable doubt before finding a verdict of guilty, * * *." The last instruction complained of is No. 11 which defendant states is erroneous because it only requires the jury to

136

believe "from the evidence" when the law requires the jury to believe beyond a reasonable doubt. Such objection appears facetious in view of the fact that the instruction reads: "The court instructs the jury that if you believe from the evidence in this case *beyond a reasonable doubt* * * * *" etc., and the contention is without merit.

The judgment of the circuit court of St. Clair County is affirmed.

*Judgment affirmed.*