(No. 11444.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK ZAMMUTO *et al.* Plaintiffs in Error.

*Opinion filed October 23, 1917.*

1. CRIMINAL LAW—*verdict of guilty must be supported by the evidence.* The Supreme Court will not usurp the functions of the jury by substituting its judgment upon the weight and credibility of conflicting testimony in a criminal case; but a verdict of guilty must be supported by evidence, and where it is apparent that the verdict is not based upon evidence proving the guilt of the accused it is the duty of the court to set aside the judgment.

2. SAME—*when motive is an important element in determining commission of crime.* If a deliberate criminal act is established by the evidence the People are not required to prove a motive for the act; but while a motive is not an essential element of crime, the presence or absence of anything which would lead the accused to commit the act is important and to be considered on the question whether he did commit it.

3. SAME—*value of foot-prints in proving identity.* Evidence concerning foot-prints may tend to prove the identity of the accused as the perpetrator of a crime, but such evidence is of no effect where it does not show any peculiarity of the foot-prints but only that the shoes worn by the accused substantially fitted therein.

WRIT OF ERROR to the Circuit Court of Winnebago county; the Hon. JAMES S. BAUME, Judge, presiding.

R. K. WELSH, and FRANK M. RYAN, for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, WILLIAM JOHNSON, State's Attorney, and NOAH C. BAINUM, for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Joe Tarantola lived at 1222 Ferguson street, a street running north and south, in the city of Rockford, with his sister, Vitina Ingrassia, and her husband, Annunzio Ingrassia, in the second story of a building on the east side of

280 — 15

the street.  The first story was occupied by his brother and wife as living apartments and the basement was used by the brother as a bakery.  The second story was reached by an outside stairway beginning somewhat back of the front of the building and running back to a platform at the southeast corner, entering the kitchen.  A little before six o'clock, after dark, in the evening of January 2, 1917, Tarantola was killed by two men at the foot of the outside stairway by shooting him from behind.  There were eight bullet wounds inflicted by two revolvers, one discharging a steeljacketed bullet and the other discharging a 38-calibre lead bullet, and a stiletto in his inside pocket was shattered by one of the lead bullets.  Immediately after the murder the two men ran south in the roadway on Ferguson street to the intersection of Hulin street, which crosses Ferguson street about 150 feet south of the place of the murder, and there was an electric arc light burning at that intersection. The men then ran down the driveway of Hulin street, east to West street, and thence between the houses in an alley and disappeared.  The ground was covered with about three inches of snow and slush.  One of the men was larger than the other and wore a gray mackinaw and the smaller one wore a long black coat.  The larger man fell down near the corner of Hulin and Ferguson streets and the other stopped and helped him up, and then they ran down Hulin street. Police officers were on the ground almost immediately and followed the course of the men.  They met the plaintiff in error Philip Caltagerone at the corner of Winnebago and Loomis streets and arrested him for the murder.  The plaintiff in error Frank Zammuto was arrested on the night of January 4, 1917, on his return from Chicago, and both were indicted for the murder and tried in the circuit court of Winnebago county.  The jury returned a verdict finding the defendants guilty and fixing the punishment of Frank Zammuto at twenty-two years in the penitentiary and of Philip Caltagerone at fourteen years.  Motions for a new

trial and in arrest of judgment were made and overruled and judgment was entered on the verdict sentencing the plaintiffs in error to the penitentiary.

There was no prejudicial error in the course of the trial but the motion for a new trial ought to have been allowed. It is the province of the jury to consider the evidence, and where it is sufficient to warrant conviction this court will not usurp the functions of the jury by substituting its judgment upon the weight and credibility of conflicting testimony. (*McCoy* v. *People,* 175 Ill. 224; *Gilman* v. *People,* 178 id. 19; *People* v. *Deluce,* 237 id. 541; *People* v. *McCann,* 247 id. 130.) But a verdict of guilty must be supported by evidence, and where it is apparent that the verdict is not based upon evidence proving the guilt of the accused it is the duty of the court to set aside the judgment based upon it. (*Waters* v. *People,* 172 Ill. 367; *Keller* v. *People,* 204 id. 604; *Dahlberg* v. *People,* 225 id. 485; *People* v. *Bolik,* 241 id. 394; *People* v. *Rischo,* 262 id. 596.) Whatever may have been the source or cause of the verdict in this case, it cannot be attributed to the evidence. The People not only failed to prove the defendants guilty of the crime with which they were charged, but the evidence in their behalf proved that they were not guilty. If a deliberate criminal act is established by the evidence the People are not required to prove a motive for the act, but while a motive is not an essential element of crime, the presence or absence of anything which would lead the accused to commit the act is important and to be considered on the question whether he did commit it. In this case the only evidence alleged to constitute a motive for the murder is the fact that in March, 1916, nine or ten months before the murder, the defendant Frank Zammuto was a watchman at the Trahern Pump Company's plant at Rockford and Tarantola came into the plant in the night time and was ordered out by Zammuto, who was making his rounds; that a short time afterwards Tarantola came in again by a back

door and was ordered out, and that there was a shooting
fray, in which Zammuto used a revolver that discharged a
steel-jacketed bullet.   The police who were called to the
plant made inquiries and made no arrest of either party
and there were no further relations between the parties.
Zammuto testified that he sold the revolver soon afterward
and that he did not know Tarantola.   There was no evi-
dence that Zammuto had or owned any fire-arms at the time
of the murder, and there was nothing in the occurrence
which would justify an inference of a desire to take re-
venge on Tarantola by killing him more than nine months
afterward.   Under the evidence of the murder it was
strange that the jury should fix a difference in the punish-
ment where two men participated equally in the act, and
if a difference can be accounted for on any rational basis
whatever, it was because the jury gave weight to the occur-
rence in March, 1916, as the cause of the murder. .

   When Caltagerone was arrested he was wearing a gray
mackinaw, and the police took one of his shoes, which was
a size eight or eight and a half, of a common make called
the Walkover, and tried it in the tracks in the snow and
found that it corresponded substantially with the foot-prints.
They searched him and found nothing but an ordinary jack-
knife, and there was no evidence that he had or owned any
revolver.   Neither the wearing of the gray mackinaw nor
the evidence as to the foot-prints tended to prove the mur-
der aside from other evidence of identity.   It is true that
evidence concerning foot-prints may tend to prove identity,
as in the case of *Schoolcraft* v. *People,* 117 Ill. 271, where
a toe turned inward, or in the manner of walking, as in
*Carlton* v. *People,* 150 Ill. 181, where the defendant was
lame and walked with a kind of hop and the foot he limped
on corresponded with the tracks, but such evidence is of
no effect where, as in the case of *Dunn* v. *People,* 158 Ill.
586, there was no peculiarity of the foot-prints.   In the
latter case the court said that any two persons wearing shoes

of the same size and number as those described in the evidence, if in the neighborhood, would have been liable to the charge with the same evidence of guilt, and that statement is applicable here. Caltagerone's shoes were wet probably a quarter of an inch from the top of the soles, which tended to prove that he had been outdoors, but that applied equally to everyone else who had been out in the snow and slush and had no tendency to prove him a murderer.

The People examined a large number of witnesses to prove the identity of the defendants with the men who ran away. Among them was a sister of Joe Tarantola, who lived up-stairs in the apartment, and at the time she was sitting in a chair in the kitchen, sewing. She looked out of the window and saw the men running away and saw the tall one fall down and the one with the long coat tried to help him up. She testified that she knew the defendants and had seen them many times, but when the police came and people gathered at the place she did not tell anyone who the men were. All that the police had was the fact that the larger man wore a mackinaw and the smaller one a long black coat, and it is unaccountable in the relation of the witness to the murdered man that she did not say who the men were who committed the murder. Another witness was the sister-in-law of Tarantola, who lived on the first floor. She was in the house and walked out and saw the two men running away. She testified that she knew who they were and had seen Zammuto looking at their place when they passed. Although the police came there at once, looking for the murderers, she testified that she did not tell anyone that night or the next day, or for a long time afterward, that she knew who the murderers were, and that she did not tell the State's attorney or any police officer until she came to the court room. The facts and the conduct of these witnesses discredit their testimony that they knew these men who were running away with their backs toward them.

Other witnesses produced by the People were Lena Sandwich, Marie Hartman, Raymond Lambert, H. G. Thomas, Jack Kennedy, William Farmer, Earl Clendenning and Verna Lucas. Lena Sandwich lived directly across Ferguson street from the place of the crime and saw the men and said that she could not tell who they were. Marie Hartman, a girl fifteen years old, was coasting and saw the flashes of the shooting and said that the two men came running toward her; that one of them fell; that there was an electric arc light burning and she was within two or three yards of the one who slipped and fell, and that she could not tell who they were and had no idea at the trial who they were. Raymond Lambert was walking just south of Hulin street, on Ferguson street, and heard the shooting. All that he could see was that one of the men had on a long black coat and one a gray coat. He did not get a very good look at them and could not identify them. H. G. Thomas was a milkman delivering milk on Ferguson street south of Hulin street and he saw the two men running away. At first he was quite uncertain of the identity of either, but finally gave an opinion that Zammuto was one of the men and that a photograph of Zammuto shown him and offered on the trial in evidence was of one of them. It appeared on cross-examination that he had talked with one of the attorneys defending the accused, and being asked if he did not say to the attorney that he could not identify Zammuto as one of the persons he saw, said he did not remember what he told the attorney and made the flippant remark that he was not under oath. He was indifferent to the question whether he had made a different statement out of court. One who has so little regard for truth as the answer of the witness to impeaching matter showed, was not entitled to much credit and his testimony related to only one defendant. Jack Kennedy saw the men running away. He was a lineman for the telephone company and lived at the corner of Ferguson and Hulin streets. He

was in his kitchen and going outside saw the men running away. When he saw the defendants in jail he did not recognize either of them, although they were in the center of the street and he was about eight feet inside the sidewalk and there was a good light there. William Farmer was on the sidewalk on the north side of Hulin street, near the men, and testified that he did not know who they were and could not identify them at all. Earl Clendenning was with Farmer when the men were passing and looked directly at them and saw the tallest one fall in front of the Ferguson home and testified that he did not know them. Verna Lucas, a girl fourteen years old, lived on West street in the second house from Hulin street and saw the men passing in the alley. It was rather dark there, but she saw them run against a woven wire fence and did not know who they were. For the defendants, Della Damon was a witness who was walking west on Hulin street when the men who were running away toward her separated and one went on each side of her. She saw the defendants in the jail afterward and saw them in court several times and testified that neither of the defendants was one of the men she saw. Antonio Garachi was passed by the two men just before the shooting and before they reached the place of the crime. He said that he had known Zammuto for a year but did not know Caltagerone and did not know the two men who passed him. There was no other evidence to connect the defendants with the murder and it was wholly insufficient.

On the other hand, the defendants proved by disinterested witnesses unconnected with them in any way that they were not present at the place of the murder at the time it occurred. Frank Zammuto had been working for the Nelson Knitting Company but laid off during the holiday period. He testified that he went back on the morning of January 2 to the building but was discharged because not needed and because he had been away from his work; that

he went home and went up-town to the main business portion of the city, where he went to the Armstrong clothing store and purchased a brown woolen shirt and a knit stocking cap; that he decided to go to Chicago to buy supplies from Settimo Cippolo, with whom he had previously dealt; that he changed his clothes and went to the Chicago and Northwestern depot and took a train at 9:58; that at the depot in Chicago he met a friend, Josippi Pirello, who was at the station to meet a cousin from Rockford, and they went together to the store of Cippolo, on Milton avenue; that he stayed over the nights of January 2 and 3 in the rear of the store with Cippolo; that he purchased a considerable bill of goods and paid for them and they were shipped to him on January 4 in two boxes, and that he returned to Rockford on the Illinois Central on the evening of January 4, reaching Rockford at 6:50, and was afterward arrested. Salvatore Collora testified that he met Zammuto about 9:30 or 9:35 on the morning of January 2 under the Northwestern viaduct, going to the depot. Frank Martezi and Tony Bella testified that they saw Zammuto in the Northwestern depot and that he got on the train for Chicago. Pirello testified to meeting Zammuto in Chicago in the depot and going with him to the store of Cippolo. Cippolo testified to the visit of Zammuto in Chicago; that he stayed with him in his room back of the store two nights and purchased the groceries, consisting of macaroni and other supplies. Zammuto's brother-in-law, Dominick Alfano, testified that he met him in the Illinois Central depot on his return from Chicago. To meet this evidence the People offered in rebuttal the testimony of two clerks at the Armstrong store, who testified that Zammuto and Caltagerone were in the store shortly after noon on January 2. They both thought that Tarantola was with them. One of them said that when he saw the dead body of Tarantola at the undertaking establishment he thought he was one of the parties who were in the store, and when he met Calta-

gerone in the hall when he was called before the grand jury, all that he could say was that his face was familiar and that he took him to be one of the men. The other clerk testified that to the best of his knowledge the man whose body he saw at the undertaking establishment was one of the three men in the store together, and it is not claimed that either one of the witnesses was right about Tarantola's being at the store with the defendants. One witness testified that Zammuto bought a gray shirt from him and the other that Caltagerone bought a pair of gloves. Zammuto was at the store in the morning and bought a brown shirt and a stocking cap, while the gray shirt that the witness saw on him at the jail was an old shirt. Caltagerone was at the store after dinner and bought a pair of gloves, and it is quite evident that these witnesses, although honest in their opinion, were mistaken. There was another witness, Dan Dwyer, who was a chauffeur for the Nelson Knitting Company, and he testified that he saw Zammuto at the Nelson Knitting Company building on the morning of January 2 at about five minutes after seven, which corresponded with the testimony of Zammuto, and that he saw him again about half-past four in the afternoon on South Main street with a package in his hands. Zammuto had a package when he came from the Armstrong store in the morning, and in view of the other evidence it is clear that this witness was mistaken as to the time he saw Zammuto with the package.

It may be said with perfect confidence that if Zammuto was not in Rockford at the time of the homicide Caltagerone was not guilty. But Caltagerone also accounted for his whereabouts during the day of January 2. He was employed by the Hess & Hopkins Leather Company in the tannery department, and on the morning of January 2 he was not well and did not get up until very late. He roomed at 519 Morgan street, at Zammuto's home, and furnished his own food supplies, which were cooked by Zammuto's

wife. He was not acquainted with Tarantola and never had anything to do with him, and there was no semblance of a motive for his taking part in the murder. He remained at the boarding house for a part of the morning and went during the noon hour to the business part of the city and bought a pair of gloves at the Armstrong store. He then attended a vaudeville performance at the Palace Theatre, and afterward, on the way down Main street, met an acquaintance, Lorenzo Mutteca. He turned west toward his boarding place and met Angelo Spataro, who was carrying a singing machine with records, and he joined Spataro and went to the home of Alfano Bushani. From there he went to the meat market to buy himself some meat for supper and for two fellow-roomers,—his brother, Carl Caltagerone, and Sam LaRosa. He reached his boarding place and delivered the meat to Zammuto's wife and she cooked it with macaroni for the evening meal. The time when these men ate their supper is fixed to a certainty. Carl Caltagerone left the factory where he worked at 4:35 and when he reached home he found Philip Caltagerone there. Sam LaRosa, who worked for the Burson Knitting Company, left his work at 5:30 and went to the boarding house and the three of them then ate their supper. The testimony of the defendant Caltagerone was confirmed by all the other witnesses, and no valid reason is apparent for doubting the testimony of any of them. The most that is claimed is some conflicting statements about who was in the Bushani home, and the police officers differ about what was said on that subject and who said it.

This recital of the evidence demonstrates the correctness of the statement at the beginning of this opinion that the defendants were not only not proved guilty but proved themselves innocent.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*