(No. 23805.—■■■■■■)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN MITCHELL McDONALD *et al.* Plaintiffs in Error.

*Opinion filed December 16, 1936—Rehearing denied Feb. 9, 1937.*

S. M. Ward, and Nobel Y. Dowell, (George W. Dowell, of counsel,) for plaintiffs in error.

Otto Kerner, Attorney General, Marion Hart, State's Attorney, A. B. Dennis, and June C. Smith, for the People.

Mr. Justice Wilson delivered the opinion of the court:

The defendants, John Mitchell McDonald and Robert Robertson, were jointly indicted in an indictment containing seventeen counts, in the circuit court of Franklin county, charging them with the manufacture, procuring or disposing of dynamite or other explosive compound with the in-

tent to sell the same or that the same might be used for unlawful injury to or destruction of property, and specifically the property of the Valier Coal Company, a corporation. A motion to quash the indictment and each count thereof was overruled. Before the commencement of the trial there was a motion to suppress evidence, which was granted in part and in part denied. The trial resulted in a verdict of guilty as to both defendants. Motions for a new trial and in arrest of judgment were overruled and judgment was entered on the verdict. Each defendant received an indeterminate sentence, being for a minimum term of not less than five years nor more than twenty-five years, as provided by statute. (State Bar Stat. 1935, chap. 38, sec. 1, par. 207, p. 1175.) The cause is here upon a writ of error.

The Valier Coal Company, a corporation, on August 26, 1935, owned and operated a coal mine in the village of Valier, Franklin county, in this State, and employed between 500 and 550 men. About forty feet south of the main mine shaft, on a three or four-acre tract of land, was a brick building about thirty-eight feet wide by sixty-eight feet long. It contained an engine room, in which was a hoisting engine on a concrete base, a motor generator, a switch-board controlling the power to the motor generator set and a liquid rheostat governing the voltage passing into the motor generator. There were cables connecting or extending from the switch-board to the motor generator, running through a depression in the concrete floor. Steel ropes extended through the building from the hoisting shaft to the hoisting drum. Railroad tracks adjoined the main shaft engine room. On the morning of August 26, 1935, at about 2:00 o'clock, an explosion partially destroyed the main engine room and much of the brick building housing the power plant. A night watchman on duty had made his rounds of the property, had punched a clock each hour and had examined the door to the engine room and found it locked each time. There were no lights on the premises. When

the explosion occurred the watchman was 400 or 500 feet south of the engine room. He saw some bricks fall, and immediately thereafter only a part of the walls remained standing. The explosion caused the walls of the building to fall outward. A fire followed the explosion. The watchman testified that he thought he heard signals on the east side of the building and had gone there to investigate. He saw no one then or previously around the mine building. The building was practically demolished and the greater part of the generator set was badly damaged. Several persons were soon at the scene of the explosion, including two repair men, a welder and a master mechanic, all employees at the coal mine, and two deputy sheriffs. After the fire was extinguished several articles and material, such as are used by electricians, were found at the scene of the explosion. Their relationship to the crime charged will be shown by the testimony hereafter set forth.

The defendants resided in Valier in a house about three blocks south and three or four blocks east of the mine of the Valier Coal Company. They had been employed at the mine in previous years but ceased working in March, 1933. The mine was not in operation on August 25 and 26, 1935. There had been labor trouble, resulting in a strike some time before the explosion. The defendants were members of an organization known as the Progressive Miners of America, and there was another organization there known as the United Mine Workers of America. At about 3:30 o'clock following the explosion, the two deputy sheriffs who had been at the place of the explosion, a member of the "merchant police" and another person went to the home of the defendants. As the four men approached the house a light which had been burning was turned off and the defendants were found in bed. McDonald had on only an undershirt and shorts. One of the four men asked McDonald if he knew anything about the explosion, and he said that he did not; that he reached home that night about

8:30 or 9:00 o'clock and soon went to bed and was not thereafter away from the house. McDonald's undershirt had black, greasy, smudgy streaks on it. When asked how the grease got on his underclothing McDonald replied that he got it there while in the basement feeding his dog. There was only one entrance to the basement, and that was from the outside of the building. The door dropped down over the basement steps, and when it was opened the interior beneath the door was found to be filled with cobwebs, which one of the deputy sheriffs brushed away with a broom. The basement appeared as if previously water had stood in it, and, upon drying, dirt was left on the floor and no footprints were made on it. Robertson told the deputy sheriffs that he had been to DuQuoin and returned about 10:30 o'clock that night. The defendants, without a warrant for their arrest, were lodged in jail, where they remained for about four days before their release on bonds. In the rear of the house where the defendants lived was a wash-basin containing dirty water, with grease floating on top, and submerged in the water was a pair of dirty, greasy, blue-denim overalls, in one of the pockets of which was a pocket knife. McDonald admitted ownership of the overalls and knife.

Among the articles found at the mine were the works of an alarm clock, face downward in a depression in the floor of the engine room, near the motor generator set. Copper and flexible wires soldered or pasted with tape were attached to the clock and extended upward several inches. Six small dry-battery cells, some fish-line wound around the connections to the clock, friction tape, about fifteen feet of unattached copper wire, a small sprocket wheel, a piece of tin embedded in a rafter, and the rim of a clock, were found in or near the engine room. At the hearing of the motion to suppress evidence Robertson admitted that in the house where he lived he had adhesive tape and a soldering iron, and McDonald admitted that he had a fish-line there. A ladder was found along the north wall of the building

under or near one of the rope-holes. These rope-holes were about three and a half feet high by five feet wide and were seven and a half feet above the foundation. The holes were covered with grease, apparently to prevent the ropes from wearing rapidly. There were also steel windows in the various walls, but they opened from the inside and were also several feet above the ground.

Members of the staff of the Scientific Crime Detection Laboratory of the law school of the Northwestern University testified to their examination of the various articles found at the partially destroyed building. A microscope, a high-gauge micrometer and a magnet were used to identify the wire found at the mine building with that connected to the clock. One of the methods of making a comparison was by viewing, under the microscope, stationary and rotated surfaces of wire showing the same series of die-marks on the separate pieces of wire, demonstrating that they were drawn through the same dies. The evidence shows that dies have distinctive markings, which are impressed on wire drawn through them. The type and general shape of the fractured ends of separate pieces of wire, on comparison, were disclosed to be parts of the same wire found at the home of the defendants. Microscopic examination was also made of various pieces of tape and their characteristics were compared. The threads running lengthwise called warp-threads, and those running in other directions, referred to as filler-threads, were counted and the number compared. Whether the pieces had been cut or torn was noted, and, with other observed facts of corresponding characteristics, the pieces were found to be parts of tape found in the home of the defendants. Insulation around wire found after the explosion was examined in a similar manner and the separate pieces were found to belong to one and the same piece as wire taken from the defendants' home. The fibers of the fish-line around the clock connections were identical with the line found at Mc-

Donald's home, as to linen composition, number of threads, color and manner of twisting. Several persons who had experience with explosives testified that a high explosive was used in the partial destruction of the building in question, and that the main force of the explosion was shown to have occurred near the motor generator in the engine room. The witnesses were able to determine whether the explosive was of a high or low type, because the former has a shattering and localized damaging effect, whereas a low type of explosive progresses more slowly in its action and has a pushing effect.

Peter Benetti, a witness for the People, who it appeared was an ex-convict and at the time of the trial was on parole, testified that he had a radio shop under a partial partnership arrangement with the defendant Robertson. The shop was in the north room of the house occupied by the defendants. The witness roomed elsewhere. He remained in Valier until August 6, 1935, and was subsequently arrested in Detroit, Michigan. He testified that there were two alarm clocks in the defendants' home, one of which bore a resemblance to the clock which was taken from the ruins of the engine room. The face and size of the shell were practically the same, and there were green colors on the clock which matched. The witness testified that the radio shop consisted of a table, the property of Robertson, a tube tester, a soldering iron, several pliers, screw drivers, wires and other accessories. He further testified that in May, 1935, Robertson asked the witness if he knew how to arrange a clock so it would complete an electric circuit, and the witness explained to him how it could be done. He also had a conversation with McDonald relative to making a switch which would be practical on the rail of a track to make a circuit, and the witness explained how wire twisted could be wrapped around a rail for such a purpose. Thereafter, in a conversation with Robertson, the latter said that McDonald had gone into a garage in Valier and set off a

cap and left wires lying around in such a manner as to cause people to wonder what they were doing. In a subsequent conversation with Robertson the latter said that he had been out with his automobile and ran it into a ditch; that Robertson said he had to have the automobile out before daylight, because it would have been too bad if anyone found out what was in it. Robertson said that he took "the stuff" from the automobile and hid it in the bushes on the side of the road until the automobile was taken out of the ditch, when he replaced it in the automobile. In one conversation with Robertson, in the presence of McDonald, they were discussing certain bills which had been introduced in the legislature. Robertson said that the Progressive miners were not obtaining any satisfaction in the legislature, and the only way to "get something out of it was to keep damaging the property of these companies so they will come to a settlement." He also heard a conversation in the defendants' home in which McDonald said, "In case the watchman gets in the way we can tie him and throw him out of the way so he won't get hurt." The defendants then changed the conversation. On one occasion the witness asked McDonald how much he got "out of these jobs," and McDonald replied about $150. In the same connection McDonald stated that if he could get a few more jobs he could purchase a road house, which he was desirous of doing. The witness testified that in the spring of 1935, at a picnic party held near the mine of the Valier Coal Company, McDonald investigated the powder house of that company and told Benetti that "no watchman came out to chase him out." At another time the witness testified McDonald asked him if he could obtain a drum for McDonald, and if dynamite would "fall" in a place in the ground. He subsequently saw McDonald with a steel drum, and afterward McDonald was washing the drum and asked the witness if two cases of dynamite would fit in the drum. McDonald, in the presence of the witness,

talked to Robertson about taking the drum to a farm for the purpose of burying it in the woods. In June or July, 1935, McDonald was taking down a stovepipe and he had a jar of detonating caps such as are used to set off dynamite by means of an electrical coil. The caps consisted of small tubes with two wires extending out of each of them. McDonald put the jar containing about twenty of the caps in the pipe and told the witness if he saw Robertson to tell him not to build a fire in the stove. The same evening McDonald, in Robertson's presence, said that he thought he would have to bury the caps somewhere. He changed his clothes, took the jar, asked Robertson for a shovel, and, on being told there was one outside the house, went out with the caps and returned in about ten minutes without them. After his arrest the witness had first denied knowledge of the facts which he related, as above stated, at the trial. The evidence shows that he had been promised assistance by the State's attorney or the assistant Attorney General in obtaining work.

A witness engaged in the garage business corroborated Benetti's testimony that Robertson's automobile had been in a ditch in January, 1935. Photographs of the damaged mine building and of articles found there after the explosion were sought to be introduced in evidence, and that of the building was admitted.

At the close of the People's evidence McDonald's attorney made a motion for a directed verdict as to McDonald, which motion was denied.

On behalf of the defendants, Ralph Uhle, a school teacher, testified that he was acquainted with the defendants; that he, Uhle, conducted school a part of the summer of 1934 in the residence of Robertson and McDonald. He testified that their reputations were good. Frank Hatcher, unemployed, testified that he knew Robertson and that previous to the coal strike he never heard anything against him. However, the witness expressed the opin-

ion that said defendant's reputation depended upon what group of persons one was in when there was a discussion of such reputation. Christina Campbell and Elizabeth Orosz, neighbors of the defendants and acquainted with them, testified to their good reputation. There was no further testimony for the defendants. The defendants themselves did not take the stand in their own behalf.

A preliminary question relative to the competency of proposed evidence on the part of the People was presented by counsel for the defendants before the commencement of the trial, upon the hearing of the motion to suppress evidence. Evidence was heard on that motion out of the presence of the jury. The motion and evidence involved the alleged unlawful search and seizure of certain property taken from the house occupied by the defendants. It is admitted that there was no search warrant. The articles and material taken from the house were such as are used by electricians. They were removed by members of the scientific Crime Detection Laboratory, heretofore referred to, and were of the same character as those used in the connections to the clock found at the scene of the bombing of the main shaft building at the coal mine. Included in the list were adhesive and friction tape, wire and pliers. The testimony on behalf of the People is that the defendant Robertson gave the persons mentioned permission to make the search. Robertson denied that he gave such permission, and testified that he was struck by two persons investigating the surroundings of the bombed mine building. Five witnesses testified that Robertson's face was swollen, his lips and mouth discolored and bruised on the inside, and one of these witnesses stated that Robertson was limping badly. Six witnesses who had occasion to see Robertson about and after the time he testified he was struck, stated that they saw no marks, swelling or discoloration on Robertson's face and did not see him limping. Those charged with using force denied that Robertson was struck

or beaten. The evidence shows that all of the property taken, except a fish-line, belonged to Robertson, and as to Robertson the motion was denied. The motion as to Mc-Donald was allowed, except as to the fish-line. While there was conflict in the evidence as to whether permission was given and whether force was used it was for the trial court to determine which of the witnesses were telling the truth. *People* v. *Reid,* 336 Ill. 421.

It does not appear that counsel for the defendants, in their motion to suppress evidence, claimed ownership of the articles, except clothing, and there was no demand or request for their return. One who consents to a search of his property waives his constitutional right subsequently to complain that the search and seizure were unlawful. (*People* v. *Mizzano,* 360 Ill. 446; *People* v. *Wetherington,* 348 id. 310; *People* v. *Preston,* 341 id. 407.) The motion was properly denied. *People* v. *Patterson,* 354 Ill. 313; *People* v. *Reid, supra.*

The major contentions of counsel for the defendants are, that the defendants did not have a fair and impartial trial, and that the verdict of the jury was contrary to the law and the evidence. The specific grounds for reversal, in addition to the preliminary contention, may be grouped as follows: (1) That a photograph was improperly admitted in evidence; (2) that inflammatory remarks were made by the State's attorney during the progress of the trial, and especially during his argument to the jury, and that one of the counsel for the defendants made remarks prejudicial to them; (3) that because of the intoxication of one of the counsel for the defendants they were not properly represented; (4) that improper instructions were given to the jury; and (5) that the evidence was insufficient to establish the guilt of the defendants, and that the verdict of the jury was contrary to the law and the evidence.

The contention with respect to the admission in evidence of the photograph of the damaged mine building is that it

might have confused the issue or appealed to the passion of the jury. In connection with this objection it is argued that the State's attorney conducted the trial as if the charge were one of bombing the mine building instead of upon the charges in the indictment. Practically all of the testimony of Benetti with respect to the facts having a tendency to show the connection of the defendants with the bombing was introduced without objection made by counsel for the defendants. Such testimony, while tending to prove a bombing occurred, also showed the preparation for it, and tended to prove the possession of explosives for the purpose of injuring the property of the Valier Coal Company. Tending to establish such proof were: The conversation of Benetti with McDonald about the making of a switch for use on the rails of a railroad; Robertson's statement about McDonald's setting off a cap in a garage and leaving wire lying loosely around in such a manner as to arouse suspicion; the conversation about Robertson's automobile being run into a ditch and the acts of secrecy to prevent detection of "the stuff" he had in the automobile; the conversation in which Robertson said that damaging property was the only way to obtain a settlement of labor troubles advantageously to the Progressive miners; the conversation about how to avoid injuring the watchman by tying him and throwing him out of the way; the conversation about the compensation which McDonald received for service described as "these jobs;" the conversation about the dynamite and hiding the drum containing it, and the conversation about the detonating caps and hiding them. These conversations related by Benetti, while tending to show the preparation for a bombing, were also pertinent to the charges in the indictment. There were other circumstances not depending upon Benetti's testimony which also had the same tendency. The greased rope-hole was large enough to admit a person from the outside to the inside of the building. A ladder was found underneath the

hole after the explosion. The distance from the ground to the hole was sufficient to require the use of a ladder. McDonald's underclothing which was found on him in bed was streaked with grease, and he attempted to deceive the deputy sheriffs as to how it got there. The light in the house was extinguished upon the approach of the deputy sheriffs. Articles belonging to Robertson as a radio repair man, and a fish-line belonging to McDonald, corresponded to the same articles found at the mine as a part of a bomb mechanism. These circumstances were more or less closely connected and bore upon the intent with which the explosives and detonating caps were possessed and that such intent was to destroy property of the Valier Coal Company.

In a case of this kind the issue of intent allows a wider range of evidence in support thereof than is allowed in the support of other issues. (*People* v. *Catuara,* 358 Ill. 414.) There was no objection to any of this testimony except the enlarged picture which counsel for the defendants stated was taken by a small camera and that subsequently the enlargement was made. Enlarging pictures, and especially documents or words and letters found therein, is a frequent practice and is merely for a more convenient exhibition in court. (Underhill on Crim. Evidence, (3d ed.) sec. 103.) The fact of enlargement does not necessarily render photographs inadmissible. (2 Wharton on Crim. Evidence, (11th ed.) sec. 773.) Certain objections to enlarged pictures were sustained. One to which objection is made was admitted. It was a picture of the building after the explosion. The enlarged photograph was merely cumulative of oral testimony. It is not apparent why this photograph had more of a tendency to emphasize the bombing than much of the testimony to which no objection was made. In any event, evidence having some tendency to prove the crime charged is not rendered inadmissible because it may prove or tend to prove the commission of another crime. (*People* v. *Rappaport,* 364 Ill. 238; *People* v. *Cozzi,* id. 20;

*People* v. *Swift,* 319 id. 359; *People* v. *McGuirk,* 312 id. 257; *People* v. *Catuara, supra.*) Moreover, it is always proper to prove motive when it can be done. (*People* v. *Zammuto,* 280 Ill. 225; *People* v. *Watkins,* 309 id. 318.) There was evidence that Robertson had expressed the belief that the destruction of property would advance the cause of the Progressive miners. The desire of McDonald to establish a road house from compensation he could receive from what is designated "these jobs" had some tendency to show motive on his part. We are unable to agree with counsel for the defendants that the enlarged photograph of the damaged building would confuse the issue or appeal to the passion of the jurors.

The second contention relates to prejudicial remarks of the State's attorney in addressing the jury. It is argued that a statement of the State's attorney to the jury that he believed each of the defendants was guilty was improper and prejudicial. An objection to that remark was sustained. In this case one of the counsel for the defendants previously had stated that the State's attorney did not believe the defendants were guilty and that his manner of prosecution was proof of that fact. The statement of the State's attorney was a reply to the argument of the counsel for the defendants, and they are not in a position to complain of a remark provoked by themselves and which was an answer to their argument. *People* v. *Shelton,* 361 Ill. 477.

Two other remarks of the State's attorney, one with respect to Benetti's character and his close association with the defendants, and another with respect to the effect of the bombing of the mine building and the possible taking of a human life, it is contended, were prejudicial. No specific objections were made at the time and the remarks are not even shown in the abstract. The objections, therefore, do not require consideration. (*People* v. *Cohen,* 363 Ill. 303; *People* v. *Stathas,* 356 id. 313.) Objections to other re-

marks not contained in the abstract were sustained and they need not be considered.

It is contended that the chief counsel for the defendants made a disparaging remark about the court, which the defendants could not prevent, and that he was not thereafter permitted to continue with the defense. It would be an easy matter to obtain a new trial if counsel for an accused person might by his conduct and remarks prejudice his client's rights so that if found guilty by a jury the defendant could obtain another trial.

What has been said with respect to the effect of conduct and a remark of counsel for the defendants is also a sufficient answer to the third contention, namely, that the defendants did not have a fair trial because of the condition of their chief counsel. The defendants were represented by three attorneys, all of whom were of their own choosing. One of them, who continued in the representation of the defendants, had many years' experience in the trial of criminal cases and his ability was recognized by the trial court. The fact that one of the attorneys for the defendants by his own volition and action was not in the best condition to represent the defendants does not afford legal ground for reversing, or reversing and remanding, a criminal cause. *People* v. *Hicks,* 362 Ill. 238.

The fourth contention is that improper instructions were given to the jury. All that is said by counsel in support of this objection is, that where the guilt of a defendant is a close question the jury should be accurately instructed, and the instructions must be based upon and be applicable to the charge in the indictment. It is not shown wherein the instructions fail in the respect mentioned. Twenty-seven instructions were submitted on behalf of the defendants and were given by the court, and only six were given on behalf of the People. They stated correct rules or principles of law and were applicable to the charge in the indictment. The only exceptions preserved to instructions

were merely as to those with respect to the form of verdict. Under the present Practice act, which is applicable in criminal cases to instructions, exceptions to the giving or refusing of instructions must be entered before the entry of a final judgment. (Practice act, sec. 67; State Bar Stat. 1935, p. 2447; *People* v. *Padley,* 363 Ill. 50; *People* v. *Pizzo,* 362 id. 194.) No exceptions, except as to the forms of verdict mentioned, were entered in this case.

The final contention is that the evidence is insufficient to justify a conviction. We have stated what the evidence shows. Although the principal witness testifying against the defendants previously had been convicted of crime, by two instructions the jurors were advised that the testimony of one previously convicted of an infamous crime could be disregarded unless the witness was corroborated by other credible evidence, and that the testimony of an accomplice is subject to grave suspicion and should be received with great caution and care. The testimony of Benetti, to practically all of which there was no objection, was supported by strong circumstantial evidence of the guilt of the defendants. The crime charged was one of a type of which it has frequently been said the evidence in most cases is not likely to be direct but the evidence is often largely, if not wholly, circumstanial. There is no legal distinction between direct and circumstantial evidence, so far as their effect and weight are concerned. (*People* v. *Francis,* 362 Ill. 247; *People* v. *Norris,* id. 492.) The evidence was sufficient to justify the verdict of the jury, and under such circumstances we are not warranted in disturbing that verdict. *People* v. *Katsovitz,* 363 Ill. 187; *People* v. *Bruno,* id. 174; *People* v. *Fitzpatrick,* 359 id. 363; *People* v. *Hicks, supra; People* v. *Cozzi, supra.*

The judgment of the circuit court of Franklin county is affirmed.

*Judgment affirmed.*