(No. 25742.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE LADAS, Plaintiff in Error.

*Opinion filed October 15, 1940.*

T. S. MORGAN, for plaintiff in error.

JOHN E. CASSIDY, Attorney General, LOUIS P. ZERWECK, State's Attorney, and A. B. DENNIS, for the People.

Mr. JUSTICE MURPHY delivered the opinion of the court:

George Ladas has sued out this writ of error to review a judgment of the circuit court of St. Clair county. A jury found him guilty of robbery and he was sentenced to the penitentiary for a term of one to twenty years. He was indicted jointly with William Bourland, who apparently was not apprehended. He urges that the court should have allowed his motion made at the close of all the evidence to instruct the jury to find him not guilty, because, he says, the evidence against him was insufficient; that prejudicial testi-

mony was admitted on the trial; that the conviction was secured as a result of improper conduct on the part of the assistant State's attorneys who tried the case, and that his motion for a new trial should have been allowed.

Dumas Scholes testified that he was robbed of $345 in bills about 3:00 o'clock in the morning of July 18, 1939, at Duck Inn on State highway Route No. 3, a few miles south of East St. Louis. He had been in the Roxy Cafe in East St. Louis earlier in the evening, where he sat at the counter and ordered a steak. He had had two or three bottles of beer, and when the steak turned out to be tougher than he had anticipated, he told the waitress that he had ordered a good tender steak and she had brought him a tough one, and that if she gave him a steak he could not eat he would give her a hundred-dollar bill which she could not change. He started to show the waitress that he had that much money, but Gus Roustiau, a customer of the restaurant and a stranger to Scholes, warned him not to display his money. Both Roustiau and Thomas Doyle testified that he did display his money, and that defendant Ladas was sitting at the counter at the right of Scholes. Ladas admitted being in the Roxy Cafe the evening of the robbery, but did not know whether Scholes was there or not. When Scholes went to his car, which was parked about a block from the restaurant, a man whom he later identified as Ladas asked him if he was going out to Duck Inn. Scholes said he was going over to St. Louis, but that he would take the man as far as the "free" or municipal bridge. As they drove along Scholes noticed that Ladas was attempting to conceal a black-jack between his legs. He became suspicious but consented to take Ladas on to Duck Inn when the latter roughly demanded that he do so. It was dark and no one was around when they approached the bridge. They met twenty-five or thirty cars in the two-mile trip from the bridge to the inn and Scholes testified

that he made use of their lights to observe the man who was riding beside him. When they arrived, Scholes said: "Well, we are here." Ladas said: "Well, I want you to get out and come in and take a drink." Scholes said: "No, I don't care for any. I am going to St. Louis." Ladas insisted, and turned toward Scholes with the blackjack in his hand. Scholes reached for his knife and stepped out of his car, so that he could reach the safety of Duck Inn. Another man who had drawn up in a taxicab behind Scholes' car attacked Scholes, and he and Ladas knocked him down, took his money and made off. William Morgan, a deputy sheriff, heard the commotion and came out of Duck Inn in time to see a car drive away at high speed. He took Scholes to East St. Louis to report the robbery to the police as soon as Scholes regained consciousness. Scholes gave the police a description of the man who had been with him in the automobile, and later in the day went to the Veterans' Hospital at Jefferson Barracks, south of St. Louis, Missouri, for treatment. On July 19, 1939, three deputy sheriffs of St. Clair county took Ladas and a man named Newman over to the hospital to see if Scholes could identify them. He identified Ladas in the presence of deputy sheriffs Hogan and Stuart but could not identify Newman. Scholes was a diabetic and his general health was not good. His vision was impaired and he wore spectacles. He lost his best pair of glasses in the robbery, and at the time he identified defendant he was using a cheap pair that did not fit perfectly. However, the defendant was within five or six feet of him while he was at the hospital. On cross-examination he stated that he had no conversation with defendant while he was at the hospital, and did not accuse him of the robbery in his presence. Counsel for defendant then moved that the testimony as to what Scholes told the deputy sheriffs be excluded, but his motion was denied. Counsel sought to discredit Scholes' identification by show-

ing that he could not see well enough to be sure that Ladas was the robber. Scholes admitted he could not tell whether the defendant was wearing a mustache or whether his lip was dark from where he was sitting at the trial, and that the nose of the defendant did not look like that of the robber, but at the end of his examination he was still positive that defendant was the robber, and did not think he could be mistaken.

When the case was first set for trial Scholes was still in the Veterans' Hospital and refused to come to Illinois to testify. A warrant was issued for his arrest and he was taken to the County Hospital in St. Louis. Two days later he waived extradition and was taken to St. Elizabeth's Hospital in Belleville where he remained until he was called to testify. No guard was kept over him there and he was given medical treatment.

John Hogan, a deputy sheriff of St. Clair county, saw Scholes about 7:00 o'clock on the morning of the robbery and obtained a description of the man who had robbed him. He was then asked: "After securing that description, did you assist in arresting the defendant Ladas?" He answered: "I asked to have him picked up. The East St. Louis police arrested him." Counsel for defendant said: "I object to what he asked." The objection was overruled. This witness then testified that he was one of the deputies who took Ladas to the Veterans' Hospital for identification on July 19. Scholes did not identify the first man taken into his presence, but positively identified Ladas. The latter ran around the room in circles to prevent Scholes from getting a look at his face, and asked the deputies for an opportunity to talk privately to Scholes. Later this witness had a conversation with Ladas as he was returning him to jail after his preliminary hearing. Ladas told him: "They got me hooked again. I was in the penitentiary once and I would have been just as well off if I had stayed there." The court

overruled a motion to exclude the conversation as being immaterial. On cross-examination Hogan testified that Scholes said: "That's him!" when Ladas was brought in, and after Ladas went out Scholes said: "I would know him in hell." The jury was instructed to disregard this last statement. Defendant's counsel then asked Hogan to repeat the conversation objected to above in which Ladas told Hogan they had him hooked again and that he would be just as well off in the penitentiary. Vivian Stuart, a deputy sheriff, testified that Scholes identified Ladas at the Veterans' Hospital.

George Ladas testified in his own behalf. He stated that when he finished working at his father's tavern he stopped by the Roxy Cafe and ate a sandwich and drank a cup of coffee; that he did not see Scholes while he was there, and when he finished eating he went to his father's home a few blocks away, put the keys to the tavern in his father's pocket and went to bed. He denied robbing Scholes and testified that Scholes did not accuse him of robbery while he was at the Veterans' Hospital. He also denied telling Hogan that he was "hooked" again and denied generally everything the officers had testified to concerning him. John Ladas, father of George, testified that the tavern keys were in his pocket when he arose the next morning and that George was in bed asleep.

We have set forth the testimony at such length to answer the defendant's contention that the evidence does not prove him guilty beyond a reasonable doubt and that the case should not have been submitted to the jury. Defendant's argument is directed at the testimony of Scholes, and it is claimed that this witness could not see well enough to identify Ladas. The jury saw and heard this witness and was in better position to pass on his credibility than we are. His testimony indicates that he was well satisfied that Ladas was one of the men who had robbed him. Although he apparently did not see well, he had on his bifocal glasses

before he was robbed. His suspicions were aroused several minutes before the robbery occurred, and it may be safely assumed that he was observing defendant as closely as the circumstances would permit. He was aided by the lights from approaching cars and had a full view of defendant's face while he was getting out of his car just before the robbery. He was within five or six feet of defendant when he identified him at the Veterans' Hospital. If his vision were as poor as defendant says it is, it is doubtful that he could have seen to drive a car. There is ample evidence to sustain the verdict. Defendant's attempts to talk in private with Scholes, his demeanor at the Veterans' Hospital, and his statement to Hogan that he was "hooked" again and had just as well be in the penitentiary may be construed as admissions of guilt. The significance of defendant's attempts to talk privately with Scholes appears in a point we will consider later, because Scholes made an affidavit in support of a motion for a new trial which indicates that he had finally been talked to by friends of Ladas. The proof shows that Ladas was in the Roxy Cafe while Scholes was displaying his money. It is a fair inference from the evidence that he conceived the plan of robbing Scholes and that he went out of the cafe and had an accomplice follow him and Scholes out to Duck Inn to help in the robbery. The court properly submitted the case to the jury.

Defendant then contends that the case is so close that the record must be free from error. He says that the conversation related by Hogan was inadmissible, because it put defendant's character in issue when he had not injected that issue into the case. As stated before, when Hogan related that defendant told him he was hooked again and had just as well have remained in the penitentiary, defendant only moved that the conversation be excluded because it was immaterial. The motion was specific, and the conversation was material. Further, it was competent as an admission.

Defendant next contends that hearsay evidence was improperly admitted when Hogan testified that he obtained a description of defendant from Scholes and asked the East St. Louis police to pick him up. The only objection to this question was as to what he asked the police to do. It will be remembered that deputy sheriff Morgan took Scholes to the East St. Louis police station to report the robbery. While it was error to permit Hogan to testify that he told the East St. Louis police to pick up Ladas this would not warrant us in reversing this judgment. Defendant also complains that it was error to permit the deputy sheriffs to testify that Scholes identified Ladas, since defendant claims it later developed that Scholes' statements to the officers were made out of the presence of Ladas. It appears from the abstract that some of the conversations testified to did take place in the presence of Ladas, although there is some confusion on that point, and the court excluded the only statement that was clearly made outside the presence of Ladas and instructed the jury to disregard it.

Defendant complains of unfair arguments and improper conduct on the part of the assistant State's attorneys. These remarks are not contained in the bill of exceptions, but are contained in an affidavit of defendant filed in support of his motion for a new trial. They should have been included in the bill of exceptions and cannot be furnished by affidavit. (*People* v. *McDonald,* 365 Ill. 233; *People* v. *Parker,* 284 id. 272.) Defendant contends that this is no longer the law, because section 74(2) of the Civil Practice act requires the trial court to include in its record every writ, pleading, motion, order, affidavit and other document filed or entered in the cause and all matters before the trial court which shall be certified as a part of such record by the judge thereof. This section sets forth the requirements for the trial court record, but does not purport to provide the manner of saving questions for review. Followed to its

logical conclusion a motion for new trial or objection to evidence would no longer be necessary, if defendant's contention were sustained.

Defendant contends that it was mandatory for the trial court to grant a new trial by reason of Scholes' affidavit. In it he said that he had not intended to identify defendant upon the trial and that the jury had been mistaken if it thought he so intended. He said he was sick and mentally disturbed at the time of the trial; that he had been held prisoner in St. Elizabeth's Hospital without any clothing, except a gown and bathrobe and slippers; that the physician who treated him threatened to remove him to the County Hospital, which is a part of the poor farm; that he feared such confinement would result in his death; that he waived extradition so he could get medical treatment; that immediately after testifying he was removed to the Veterans' Hospital; that he read in the papers about the conviction of Ladas and immediately telephoned John Ladas, the father of George, and offered to make this affidavit so that justice might be done. R. V. Gustin, one of the assistant State's attorneys, filed a counter-affidavit in which he stated that he was present in the grand jury room and heard Scholes testify that he had known Ladas by sight a long time; that he went to the Roxy Cafe at 3:00 A. M.; that he ate a steak and then went to his car; that Ladas asked him if he could ride with him to Duck Inn; that he took him along but Ladas refused to get out of the car; that Scholes got out of the car and Ladas hit him with a black-jack and a second man hit him from the rear. Defendant relies on *People* v. *Heinen,* 300 Ill. 498, *People* v. *Pezutto,* 255 id. 583, and *Fletcher* v. *People,* 117 id. 184, in support of his claim that a new trial should have been ordered upon the basis of Scholes' affidavit. In *People* v. *Heinen, supra,* three witnesses identified a defendant in a robbery case. After the jury returned a verdict of guilty they wrote

428

letters to the State's attorney in which they stated that they had changed their minds about the identification. Under the facts of that case we ordered a retrial. In *People* v. *Pezutto, supra,* two witnesses upset defendant's alibi by testifying that there was in fact no house of ill-fame in a certain building as testified by defendant. The witnesses checked their testimony after a verdict of guilty and found that they were mistaken. We said a new trial should have been granted under the facts of that case. The granting of a new trial is always a question for the court and not for the complaining witness, and a new trial should only be granted in the interests of justice. The cases relied on by defendant are different on the facts. In them it appeared from all the circumstances that the witnesses were mistaken and had testified falsely at the trial. Here the contrary appears. Scholes' testimony is more plausible than his affidavit. There is no doubt whatever from his testimony that he intended to and did identify Ladas. Where that is true, the trial court is not bound to grant a new trial so that justice may be thwarted. The motion for new trial was properly overruled.

The judgment of the circuit court is right, and it is affirmed.

*Judgment affirmed.*