**People of the State of Illinois, Plaintiff-Appellee, v. Robert Ingersoll, Defendant-Appellant.**

**Gen. No. 49,663.**

First District, Third Division.

April 22, 1965.

Doris A. Coonrod, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Paul A. O'Malley, Assistant State's Attorneys, of counsel), for appellee.

217

MR. JUSTICE SULLIVAN delivered the opinion of the court.

Defendant Robert Ingersoll appeals from the judgments based upon jury verdicts, convicting him of the crime of rape of Pamela Kushner, and the crime of rape of Carolyn Rab. The defendant was sentenced to a minimum of 5 years and a maximum of 15 years on each indictment, and said sentences were to run concurrently. The appellant contends (1) that the court erred in admitting the testimony of Nola Cory, a witness, as to the details of the statement made to her by Carolyn Rab and Pamela Kushner; (2) that the court erred in admitting the testimony of Earl L. Green, a witness, relative to the conversation between himself and a farmer outside the presence of the defendant; and (3) that the evidence in the record was insufficient to support the finding of guilty.

Defendant Robert Ingersoll was indicted with one Jose Armando Pantoja in two indictments. One charged both defendants with rape and robbery of Pamela Kushner, and the other charged both defendants with rape and robbery of Carolyn Rab. Motion for severance was granted and defendant Ingersoll was tried on both indictments. He was found guilty of rape of Pamela Kushner and not guilty of robbing her. He was found guilty of rape of Carolyn Rab and not guilty of robbing her.

The State's evidence showed that on May 10, 1963, Carolyn Rab and Pamela Kushner had left the Lincoln Theater in Chicago Heights at about 11:35 p. m. and after having coffee and a root beer were on their way to Pamela's house. They were no more than four or five houses from Pamela's house when they were accosted by Ingersoll and Pantoja. Ingersoll, accompanied by Pantoja, forced his way into the car being driven by Carolyn Rab at gun point, and took her and Pamela Kushner to a wooded area near a farm house,

and forced them to have sexual relations. While in this wooded area Robert Ingersoll had sexual relations with Carolyn Rab three times. Carolyn Rab testified that Robert Ingersoll at all times had his gun in his hand and that he forced her to have sexual intercourse. That following the attacks upon Carolyn Rab, Miss Kushner, at gun point, was then forced to accompany this defendant outside the car. Pamela Kushner testified that she was forced by the armed defendant to have intercourse with him outside the car, leaving Carolyn Rab in the car with the armed codefendant. Carolyn Rab also testified that Ingersoll took her purse and removed money from it, and that he also took money from Pamela's purse.

The girls pleaded to go home and some time after 4:00 o'clock in the morning, the defendant, driving the car of Carolyn Rab, who was nineteen years of age, drove back to the place where Pantoja had left his car. Pamela Kushner gave directions on the way back. Pantoja then entered his car and followed the defendant who was driving Miss Rab's car. Both cars were driven to a location on Sauk Trail where the girls were put out of the car. Miss Rab's car was then left a short distance down the road. Carolyn Rab saw a little house nearby on the road. Both Carolyn and Pamela ran to it and awakened a farmer, who observed that the girls were crying and he let them in. The farmer, his wife and a little boy were there. The farmer left, was gone 15 or 20 minutes and came back with a policeman. The girls got in the policeman's car and went to a Standard gas station. They then went to the town of Matteson and later to St. James Hospital in Chicago Heights where the girls were examined.

A physical description of the men and their car was given to the police. Thereafter, on May 21, 1963, at 2:00 p. m. Pamela Kushner, Officer Rekau, Officer

Romano and Carolyn Rab went to the Idlewild Country Club. They identified the defendant Ingersoll as he walked out to the pool, took a lawn chair and walked back under the window from which they observed him.

Carolyn identified a .38 caliber Smith & Wesson Special revolver as one similar to the one carried by the defendant. She also identified an Astra Uncetay, 6.35, .25 inch revolver as being one similar to the one carried by Pantoja.

Nola Cory testified that she was a resident of the farm house and that the girls arrived there about 4:00 a. m. and complained of having been raped.

Donald D. Anderson testified that he saw the defendant in his service station at about 11:00 p. m. and again at 4:00 a.m. the following morning on the day of the occurrences. That he had given the defendant change for a $5 bill.

A police officer testified to the recovery of a gun belonging to Robert Ingersoll, pictures from the wallet of Carolyn Rab and her father's name, address and phone number written on a piece of paper.

The chief of police of Matteson testified that he was at the arrests of both of the boys and that he had recovered the girls' wallets. That Ingersoll told him he had another gun at home and it was turned over to the police.

A statement made by Ingersoll to the police was read to the jury by the assistant state's attorney. In the statement Ingersoll stated that he and Pantoja had met these girls and talked to them; that they parked and had sexual relations but he denied the use of the guns or any form of force. He admitted buying cigarettes in the service station and stated that he got the name of Norman Rab, the father of Carolyn Rab, from the phone book because he was going to call the girl again. He denied taking any money from the girls' purses

220

and denied having any guns with him, but he stated that he had described the guns to Carolyn.

The defendant's mother testified that she was at home on the evening of May 10, 1963. That her son's guns were at home on the bed where he had been cleaning them. She had asked her step-daughter to remove the sheets from the bed and she refused to do so until the guns were removed.

The defendant's step-sister testified that she, likewise, was at home the evening of May 10, 1963. Her step-mother asked her to remove the sheets from the beds. She would not remove the sheets from Robert's bed until her step-mother put away the guns which were there.

The defendant did not testify.

The defendant's first contention is that the court erred in admitting the testimony of Nola Cory as to the details of the statement made to her by Carolyn Rab and Pamela Kushner. Nola Cory testified to a complaint made to her by the girls. In answer to a question by the state's attorney she said, "Well, when they first came in the house they said they had been raped." An objection was made by counsel for defendant and the court allowed the witness to testify further, as follows:

"Q. Would you state the conversation?

A. They said they had been raped at gun point and that at the time it seemed—it seemed like the people were pretty excited or something. I don't know.

Q. Did they say anything about their money?

A. Yes, one girl said that she had money that was missing."

The defendant contends that while in rape cases testimony of a witness is admissible to show that shortly after the commission of the alleged offense the prosecutrix made a complaint, nevertheless, it is not admissible as proof that the crime was in fact committed. In support of this contention the defendant cites People v. Davis, 10 Ill2d 430, 140 NE2d 675. In that case the defendant was being tried for the crimes of forcible rape, statutory rape and assault with attempt to commit rape upon a 14-year-old girl. There the complaining witness's mother testified that her daughter was hysterical and there wasn't much she could get out of her, and that the complaining witness said, "Mother, he threatened to kill me." The mother also testified that the complaining witness told her that defendant also threatened to kill Billy; that he said he would cut her guts out if she didn't lay down and shut up; that he said if she didn't do what he wanted her to do he would kill her; and that complaining witness said, "Mother, he did it to me." The court in that case held that the declarations preceding the words, "Mother, he did it to me" were merely introductory, and since they did not relate the details of the offense, the testimony was within the limitations prescribed by law. Evidence of such complaint was held admissible on the theory that the natural instinct of a female thus outraged prompts her to express her indignation at the injury inflicted upon her, and it is deemed relevant on the ground that it corroborates her statement that she was assaulted. In the instant case, immediately after they had been released by the defendants, the prosecuting witnesses ran to the Cory farm house where they made the declarations complained of to Nola Cory. During the testimony of Nola Cory the circumstances surrounding the statement by the prosecuting witnesses were clarified as follows:

". . . Q. Calling your attention to the early morning hours of the 11th of May, 1963, were you awakened during the early morning hours?

A. Yes, sir.

Q. About what time in the morning was it?

A. Around 4:00 o'clock in the morning, I think.

Q. Do you know if prior to this time if anyone in the house might have been up?

A. No.

Q. Will you state to the Court what if anything you first heard and where you were at the time?

A. Well, we were all in bed asleep at the time and we all heard screams and pounding on the door.

Q. And what if anything did you do after you heard this?

A. We got right up and went to the door. My husband opened the door, saw the girls and let them in the house.

Q. Were these two girls Pamela Kushner and Carolyn Rab?

A. Yes, sir.

Q. Would you describe their condition at that time?

A. Well, the girls were very nervous and upset and crying and screaming.

Q. Did they both come right in?

A. Yes.

Q. Did you have a conversation with both girls?

223

A. Yes.

Q. Would you state to the ladies and gentlemen of the jury what they said to you at that time?

A. Well, when they first came in the house, they said they had been raped.

Miss Coonrod: Your Honor, I will object to the conversation outside of the presence of the defendant.

The Court: The objection is overruled.

Mr. Kenny: Q. Would you state the conversation?

A. They said they had been raped at gun point and that at the time it seemed—it seemed like the people were pretty excited or something. I don't know.

Q. Did they say anything about their money?

A. Yes. One girl said that she had money that was missing."

It is obvious from reading the testimony of Nola Cory that the conversation related by her occurred immediately following the victims' escape from their assailants, and that both girls were suffering from mental and physical shock, and that their statements related to the circumstances of the occurrence. Here as in the Davis case, the statements did not relate the details of the offense. It was obviously a spontaneous, sincere and unreflecting utterance by the victims, and is within the bounds of the spontaneous declaration rule.

In People v. Damen, 28 Ill2d 464, 472, 193 NE2d 25, 30, the court said:

"The basis of their admission is that it is entirely natural that the victim of forcible rape would

have spoken out regarding it, and the fact that she did not do so would in effect be evidence of the fact that nothing violent had occurred. If proof of such complaints were not permitted, the judge or jury might naturally assume that no complaint was made, and it is for that reason the prosecution is allowed to forestall this assumption by showing that the woman was not silent and that a complaint was in fact made. . . . Our decisions have generally required that the complaint be promptly made. (People v. Symons, 23 Ill2d 126, 130; People v. Furlong, 392 Ill 247, 250), but we have also admitted proof of complaints made some two months following the occurrence where the interval of delay was satisfactorily explained."

■ ■ It is true in Illinois under People v. Davis, 10 Ill2d 430, 140 NE2d 675, and People v. Cappalla, 324 Ill 11, 154 NE 451, that if the complaint is made in response to questions it is not admissible, and when the fact of such complaint is admissible any details of the transaction and the name of the person charged are not admissible.

In People v. Poland, 22 Ill2d 175, 181, 174 NE2d 804, 807, the court said:

"Three factors are necessary to bring a statement within the exception as to hearsay rule: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. (6 Wigmore, Evidence, 3d ed sec 1950; Cleary, Handbook of Illinois Evidence, sec 13.28.)"

■ The testimony of Nola Cory concerned a spontaneous statement made to Nola Cory in the absence of time to fabricate and related to the circumstances of

the occurrence. We do not believe that the statements given by the complaining witnesses, as testified to by Mrs. Cory, could be construed as containing details of the offenses, and assuredly they did not mention the names of the assailants.

■ While we agree with the defendant that the testimony of Nola Cory relative to the complaint made to her by the prosecuting witnesses would not be admissible as proof that the rape was in fact committed, there was sufficient other evidence to support the conviction and the testimony was admissible under the spontaneous declaration rule.

The defendant's second contention is that the court erred in admitting the testimony of Earl L. Green relative to the conversation between himself and the farmer, outside the presence of the defendant.

Earl L. Green is a police officer. He testified he was "checking" a car parked on Sauk Trail with its lights on when a farm citizen came up and told him that two girls had been raped. In answer to the state's attorney's question, "What, if anything, did the man say to you?" Officer Green answered, "The man came up to me and he told me the two girls was up to his house, which was roughly about two and a half blocks, and they say they had been raped." The defendant argued that the result of Officer Green's recitation before the jury as to what was told him was that it implied that the complaint of the prosecuting witnesses was further corroborated by the farmer.

The farmer did not testify.

■■ The defendant contends that the testimony of Officer Green did not fall within the exception to the hearsay rule described in People v. Davis, 10 Ill2d 430, 140 NE2d 675, and should not have been admitted. This testimony was clearly hearsay. "Hearsay is evidence not proceeding from the personal knowledge of the witness, but from the mere repetition of what

he has heard others say." 18 ILP Evidence, sec 111. This same witness gave earlier testimony on direct examination wherein he described the same conversation he had with the farmer without an objection by defense counsel. Such testimony follows: "Q. What if anything did you do when you saw the car? A. I waited for about thirty-five or thirty minutes. I went to check the car out and while I was checking the car, a farm employee, a farm citizen, came up and told me that—mentioned that two girls had been raped. Q. Now, officer, you say you waited thirty-five, forty minutes. Were you parked right near this car for thirty-five, forty minutes? A. No, I was parked about a half of a city block from the car." Since this objectionable testimony was placed before the jury without objection on this occasion, by failing to make proper and timely objection to the admissibility of the evidence, trial counsel waived his right to complain of the admission of that evidence in this court. People v. Trefonas, 9 Ill2d 92, 98, 136 NE2d 817, 820; People v. Williams, 28 Ill2d 114, 116, 190 NE2d 809, 810.

 In view of the fact that this testimony had been given to the jury without objection, we cannot see how a later recital of the same hearsay matter over the objection of the defendant would constitute reversible error. There was in this case the testimony of the two complaining witnesses who had already testified to the details of the rape together with the circumstances of their identification of the defendant, and it could hardly be considered of such significance as would justify reversal when the entire record is viewed as a whole. People v. Ladas, 374 Ill 419, 29 NE2d 595.

The defendant finally contends that there was insufficient evidence in the record to support the finding of guilty. From the facts in this case, most of which have been set forth herein, there can be no doubt that

the defendant was proven guilty beyond a reasonable doubt. The testimony of the two complaining witnesses showed that the defendant at all times had a gun which he brandished before both of the girls. Their testimony further showed that after the defendant's attacks upon Miss Rab, she was returned to the car, placed in the custody of the armed codefendant and Miss Kushner was then forced at gun point to accompany the defendant outside the car.

Although the defendant did not testify, his written statement taken at the Park Forest police department shortly after his arrest on May 21, 1963, was read into evidence. His statement set forth that he had sexual intercourse only with Carolyn Rab, twice in the car but with her consent. After admitting having had intercourse he stated that he had denied this at first because of his wife, and that he "didn't think it would get back to her." He thought that they would "keep their mouths shut."

In his statement the defendant further admitted that he was the owner of guns similar to the ones the defendant and codefendant were accused of possessing at the time of the abduction and rape.

 A conviction of rape is warranted when there is a satisfactory showing made that the accused through force or threat of force overcame the victims' will to resist, and from the evidence in this case the jury most assuredly could have concluded beyond a reasonable doubt that the defendant was guilty of forcible rape of the two girls. The law of Illinois is that the testimony of one witness alone is sufficient to convict even where the evidence may be conflicting and the witness' testimony is contradicted by the accused, since conflict in the testimony applies solely to the weight of the evidence and the credibility of the witnesses, which are matters to be left for the jury's determination. People v. Edmunds, 30 Ill2d 538, 543,

198 NE2d 313; People v. Elder, 25 Ill2d 612, 614, 186 NE2d 27, 28.

Under this last point the defendant also suggested that since the same force was relied upon by the prosecution to sustain the robbery as was used to sustain the rape, namely, the possession of a gun, it would seem that the jury would be required to believe that the defendant-appellant either had a gun and raped and robbed the complainants or he did not have a gun and committed neither crime.

It is true that the jury found the defendant not guilty of the charge of robbery. We have not set forth in full the facts regarding the alleged robbery for the reason that the defendant was found not guilty of that charge. Nevertheless, from the record in this case, had the defendant been found guilty of robbery, the evidence would have supported such finding. We cannot speculate as to why the jury found the defendant not guilty of robbery, but their doing so does not in the least affect the finding of guilty of the charge of rape.

Judgment affirmed.

DEMPSEY, P. J. and SCHWARTZ, J., concur.