(No. 24407.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MEYER GOLDSTEIN, Plaintiff in Error.

*Opinion filed December 17, 1937—Rehearing denied Feb. 3, 1938.*

RITTENHOUSE & MAROVITZ, (ABRAHAM L. MAROVITZ, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and A. B. DENNIS, (EDWARD E. WILSON, JOHN T. GALLAGHER, BLAIR L. VARNES, and MELVIN S. REMBE, of counsel,) for the People.

Mr. CHIEF JUSTICE FARTHING delivered the opinion of the court:

Meyer Goldstein was indicted at the July, 1936, term of the criminal court of Cook county for the crime of forgery on June 16 preceding, by possessing, publishing, uttering and attempting to pass certain forged debenture bonds as genuine bonds of the American Telephone and Telegraph Company, a corporation, with intent to prejudice, damage and defraud the Main State Bank, a corporation. A jury found defendant "guilty of forgery in the manner and form as charged in the indictment." Motions for new trial and in arrest of judgment were overruled. Judgment was entered on the verdict and defendant was sentenced to the penitentiary for a term of one to fourteen years. The cause is here on writ of error.

Defendant is president of the Reliable Wholesale Tailoring Company, a corporation, of Chicago, and in January, 1936, a Mr. Deutsch, an associate of defendant, introduced him to L. Shirley Tark, president of the Main State Bank. Defendant desired to open a credit account for the company. Shortly thereafter Tark visited defendant's place

of business and requested him to furnish a financial statement of the company on its letterheads. The statement listed, among other securities, $8000 par value five per cent bonds of Imperial Irrigation District, El Centro, California, which were, at that time, hypothecated at the Milwaukee National Bank by defendant's company, to secure a $3000 note. The current market value of these bonds was $5600 and defendant told Tark he had collected the interest due January 1, 1936, and that all the bonds listed on the statement belonged to the company. The next interest due date was July 1. An arrangement was made for a loan of $5300 by the Main State Bank to defendant, and on January 16 defendant signed a secured note for $2800 and an unsecured note for $2500, under a verbal agreement that the collateral could not be withdrawn by defendant until both notes were fully paid. The net proceeds were credited by the bank to the tailoring company. As a part of this transaction defendant gave an order on the Milwaukee National Bank for delivery of the above bonds. The Main State Bank paid the $3000 note and received the bonds from the Milwaukee National Bank.

About April 1, defendant wanted to withdraw these bonds but was informed by Tark that to do so he must pay both notes as originally agreed. Defendant then offered to substitute American Furniture Mart and Wilmar Gas Company bonds which he said he would bring in, but did not. Tark next saw defendant late in May, with another man, presenting a check to the bank's teller, handed him by the stranger, in payment of the $2800 secured note. When Tark saw him, defendant came over to him in an excited manner, but Tark refused to release the bonds unless the unsecured note was also paid, so defendant did not take up either note. On June 16, defendant applied to the bank for a loan of $7000 on the security of ten $1000 par value American Telephone and Telegraph Company bonds, which he said he had just bought. He discussed the application

with and exhibited these bonds to Tark and to Elmer S. Ascherman, vice-president and cashier of the bank. Both immediately detected the proffered bonds were counterfeit but did not tell the defendant. He was then asked where he purchased the bonds and defendant told them he had bought them of Marks Laser & Co., a LaSalle street firm, at 111½. Defendant signed a note to the bank for $7000 and left the bonds without then receiving credit therefor, being told that the bank must first ascertain whether the Federal Reserve regulations permitted it to make a loan of more than forty-five per cent on listed bonds. Ascherman at once called Marks Laser & Co. and was informed they had no record of Goldstein purchasing the bonds. He then called defendant and reported this information, whereupon defendant said he believed his brother bought them. He was asked to bring over the paid bills, which he said he had in the office, showing when and where the bonds were bought. He reported back to the bank that he had been looking in the files but did not find them but said he could not have had the bonds unless he paid for them. The next morning defendant sent his office girl to the bank. Ascherman then had a telephone conversation with defendant who demanded credit for the bonds or their return to him, which the bank refused. Defendant was arrested that day and taken to the State's attorney's office. After being first warned of his constitutional rights he there made a signed statement. The substance of this statement, which was made in the presence of Tark and several others, was that he had obtained the American Telephone and Telegraph Company bonds from one Leo Stephens, whose residence he did not know but whom he reached by having him paged in the lobby of the Sherman hotel; that his first acquaintance with him was in 1935, when Stephens appeared in response to defendant's advertisement of a reward for the return of merchandise stolen in a burglary of his business place; that Stephens appeared and said he could help him but the

"police beat him to it;" that Stephens later came to his place several times and, in January, 1936, mentioned these bonds; that defendant told him he had some securities, including at that time $8000 six per cent 1940 American Furniture Mart bonds, for which he said he was offered 67 or 69, $2000 Randall Manufacturing Company six per cent bonds, called in February, 1936, at 102, and $6000 six per cent Wilmar Gas Company bonds for which he had a previous offer of about 44 to 47. He also said these were all unlisted bonds. Stephens offered to and did exchange the $10,000 par value of American Telephone and Telegraph Company bonds for defendant's bonds, for which defendant said there were no buyers.

N. H. Whiteside, Jr., who had been employed by the American Bank Note Company for sixteen years, testified he was familiar with the methods of engraving, with the paper and type of ink used and with the original issue of the American Telephone and Telegraph Company bonds, the entire issue of which was printed by his company. He further testified that the bonds in evidence and which he had examined, were not a part of the original issue, were printed on a watermarked paper not used by the company and were in one color, while the originals were in two colors, that the numbering was different and the general character of the impression of the bonds varied from the originals and that the vignette was particularly bad.

Over objections of defense counsel the court admitted in evidence proof that the Imperial Irrigation District bonds were stolen in a bank robbery in Glendora, California, on May 2, 1933, but it was stipulated the defendant was in no way connected with the robbery. The defendant did not testify.

Defendant first urges that the general form of verdict returned, by omitting any finding of intent to defraud, impliedly acquitted defendant of an essential element of the crime and, therefore, was not legally sufficient to convict.

In support of his contention, he cites *Fox* v. *People,* 95 Ill. 71, *People* v. *Lee,* 237 id. 272, *People* v. *Ellis,* 309 id. 51, and *McKevitt* v. *People,* 208 id. 460. In the *Fox case* a defective instruction was given which did not require any finding of fraudulent intent in a forgery case involving making and uttering, etc. The verdict in the *Lee case* found defendant guilty of "harboring a female under the age of 18 years of age in a house of prostitution in manner and form as charged in the indictment." It was clearly defective in not finding the female was unmarried and in not finding defendant was keeper of the house, both facts being essential elements of the offense as charged in the indictment. The *Ellis case* involved a verdict of "assault with a deadly weapon" where, under the statute, different grades of assault were enumerated, with graduated penalties for each. The defendant was sentenced on the basis of an assault justifying the imposition of the maximum penalty. The verdict was held defective in omitting apt words finding the defendant guilty of the greater offense. The *Mc-Kevitt case* involved a "manner and form" verdict of robbery, while the indictment of one count covered at least two grades of statutory robbery, and, under the verdict as returned, this court held the defendant could not be punished for the more aggravated form unless the jury had found him guilty thereof. None of these cases are applicable under the facts here. The form of verdict returned was sufficient. (*People* v. *Newcom,* 318 Ill. 188; *People* v. *Hein,* 315 id. 76; *People* v. *Quesse,* 310 id. 467; *People* v. *Kuhn,* 291 id. 154.) Proof was made that the forged bonds were uttered by the defendant under circumstances from which an intent to defraud might be presumed. *People* v. *Katz,* 356 Ill. 440.

Defendant next asserts the trial court committed prejudicial error in admitting the Imperial Irrigation District bonds in evidence and in permitting the People to prove they were the proceeds of a bank robbery in California,

in 1933. To support his contentions, *People* v. *Kubulis,* 298 Ill. 523, *People* v. *Lardner,* 296 id. 190, *People* v. *Emmel,* 292 id. 477, *Janzen* v. *People,* 159 id. 440, *Anson* v. *People,* 148 id. 494, and *Fox* v. *People, supra,* are cited. We have examined each of those cases but do not find any of them controlling under the facts in the instant case. The People had the right to show defendant had pledged these stolen bonds to secure a loan at the bank, in order to disclose a motive for repossessing them before the bank could send the July 1 coupons for collection. There was evidence to show it was the custom of the bank to require all unmatured coupons to be attached to the bonds taken as collateral, and that it would clip the coupons a few days prior to their due date and send them through for collection. Although defendant had previously pledged these bonds with another bank, that bank had allowed him to remove the next maturing coupons at the time they were pledged, and he had informed the Main State Bank that he had collected the interest coupons due in January, 1936. He knew that if the bank sent the July 1 coupons for payment it was probable the stolen bonds would be traced directly to him. The record shows he was much concerned about withdrawing these bonds before July 1. These facts afforded evidence of a motive prompting him to tender the spurious American Telephone and Telegraph Company bonds to the bank as collateral, which, upon acceptance by the bank for the purpose offered, would have given him possession of the Imperial Irrigation District bonds before July 1. In *People* v. *Rooney,* 355 Ill. 613, this court said it is always proper to prove motive when it can be done, as the presence of a motive which would lead the accused to commit the act charged is important in the consideration of his guilt or innocence and, further, that evidence of other crimes is generally competent to prove the specific crime charged when it tends to establish a motive. The trial court did not commit error in admitting this evidence.

Defendant next complains of the People's given instructions numbered one and four. Instruction number one stated: "Circumstantial evidence in criminal cases is the proof of such facts and circumstances connected with or surrounding the commission of the crime charged tending to show the guilt or innocence of the party charged. Circumstantial evidence is legal evidence and must be so considered by you." The assertion is made that this instruction told the jury, in mandatory and coercive language, to convict the defendant upon the facts and circumstances tending to show guilt. We think the claim made is far-fetched and that the language of the instruction is not susceptible to the criticism made. The court gave, at the defendant's request, an instruction on circumstantial evidence setting out, in detail, the necessary elements defendant says are omitted from the instruction complained of. People's instruction number four is merely an instruction defining forgery in the language of the statute, and was properly given.

Defendant further urges that the assistant State's attorney made prejudicial remarks in his opening statement, closing argument and during the course of the trial. The first objection is to references made by him to the Imperial Irrigation District bonds as being stolen, and the statements relative to defendant trying to withdraw them from the bank before July 1 to avoid discovery of his possession. What we have said heretofore about these bonds is sufficient answer to this objection.

Defendant also complains that he was prejudiced by the assistant State's attorney in offering the American Telephone and Telegraph Company bonds in evidence by referring to them as counterfeit bonds. The evidence was uncontradicted that they were spurious and, therefore, we fail to see any proper ground for the complaint. The cases of *People* v. *Faught,* 343 Ill. 312, and *Fox* v. *People, supra,* cited by the defendant, are not in point.

Lastly, defendant asserts the evidence was wholly circumstantial and failed to show him guilty beyond a reasonable doubt. He says there was no evidence in the record that the American Telephone and Telegraph Company had any legal existence and that there must be legal proof of that fact, relying upon *People* v. *Fryer,* 266 Ill. 216. In the present case proof of the company's existence was made by general reputation and that sufficed. (State Bar Stat. 1935, chap. 38, par. 266, p. 1185.) The defendant also urges that the law required proof that the American Telephone and Telegraph Company issued and circulated bonds in the similitude of the alleged forged bonds, and that such proof could be made only by calling an officer of the company and producing the charter, or some official evidence of the company's legal existence, authority to issue, and the actual issuance of, the bonds. *Goodman* v. *People,* 228 Ill. 154, cited in support of this claim, is inapplicable. It involved an indictment for forging a railroad company pass where this court held it necessary, under the facts of that case, to establish the existence of the railroad. It was shown there was a genuine issue of these bonds by the company, the date of their issuance and maturity, and their series. This was sufficient.

Proof was made that the bonds in question were forgeries. They were instantly detected, as such, by the bank's officers when offered for a loan. The circumstances accounting for defendant's possession of the bonds were significant. He first informed the bank he had recently purchased them of Mark Laser & Co. When advised they had no record of his purchase he said they might have been purchased in the name of his brother and that he would look up the bills in his files, but reported he was unable to find them. In the statement defendant made and signed in the State's attorney's office the evening of his arrest, he says he acquired these bonds by exchanging certain bonds he owned, with a Mr. Stephens, whose res-

idence he did not know but whom he reached by having him paged in the lobby of the Sherman hotel. According to his own statement he gave unlisted bonds owned by him for which he said there was no market and which, at the highest value he put upon them, were worth $10,380, in exchange for American Telephone and Telegraph Company bonds which he stated were then worth $11,325, or practically $1000 in excess of the value of his own bonds.

The uncontradicted evidence is that the American Telephone and Telegraph Company bonds were forgeries and that defendant deposited them with, and attempted to secure a loan on them from, the Main State Bank. There is also abundant evidence in the record to justify the jury in finding the defendant knew the bonds were forged. The verdict was amply supported by the evidence and the defendant was given a fair and impartial trial, free from prejudicial error.

The judgment of conviction is, therefore, affirmed.

*Judgment affirmed.*